**RIVERSIDE RESEARCH INSTITUTE, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 87–1442.**

United States Court of Appeals, Federal Circuit.

Nov. 1, 1988.

---

Richard M. Sharfman, of Sharfman, Shanman, Poret & Siviglia, New York City, argued, for appellant. With him on the brief, was James A. Shanman, of Sharfman, Shanman, Poret & Siviglia, New York City. Of counsel, was Raymond S.E. Pushkar, of McKenna, Conner & Cuneo, Washington, D.C.

James M. Kinsella, of the Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for appellee. With him on the brief, were James M. Spears, Acting Asst. Atty. Gen., David M. Cohen, Director, and Thomas W. Peterson, Asst. Director.

Before ARCHER, MAYER and MICHEL, Circuit Judges.

ARCHER, Circuit Judge.

Riverside Research Institute (Riverside) appeals from the decision of the Armed Services Board of Contract Appeals (ASBCA or Board) holding that Riverside did not incur an allowable cost based on the acquisition of new leasehold improvements which were paid for by Riverside's former landlord in consideration of its surrender of its leasehold interest in that landlord's building prior to the end of the lease term. We reverse.

*Background*

Riverside is a not-for-profit corporation which performs research, development and experimental work for the government. Government contracts account for between 95 and 99 percent of Riverside's business. In 1970 Riverside leased premises at 80 West End Avenue in New York City from Warwick Investors (Warwick) for a ten-year term. Riverside had an option to extend the lease for five years. Riverside exercised this option, thus securing the right to remain in the leased premises until September 30, 1985.

In March of 1981, Warwick (Riverside's landlord) offered Riverside one million dollars to vacate the 80 West End Avenue premises (the former location) before expiration of the lease and move to another building in Brooklyn. Riverside rejected this offer but independently looked for replacement office space. Suitable space, owned by Newmark Realty Company (Newmark), was found at 330 West 42nd Street in New York City (the Newmark location).

On September 21, 1981, after negotiations, simultaneous agreements were executed between Riverside, Warwick, and Newmark whereby: (1) Riverside and Warwick agreed that Riverside would terminate its lease at 80 West End Avenue and vacate those premises approximately three and one-half years before expiration of that lease; (2) Riverside leased space from Newmark for a ten-year term; and (3) Warwick agreed to pay for the construction of leasehold improvements at the Newmark location. Warwick subsequently spent approximately $1,700,000 in construction of the leasehold improvements at the Newmark location.

Riverside reported a "gain" on termination of the lease in the amount of $2,573,079 by recording on its books an increase in fund balances in that amount. It also recorded a corresponding increase in its assets for the new leasehold improvements. It arrived at this figure by using a valuation of $2,750,000 for the new leasehold improvements at the Newmark location and subtracting the unamortized value of the improvements at its former location, plus other directly related moving costs totaling $177,000.

Warwick had appraised the fair market value of the improvements it had made at 2.97 million dollars, and this estimate had been confirmed as "reasonable" by the construction manager retained by Riverside to oversee the project, and by the architect.

Riverside then amortized the new leasehold improvements over the ten-year period of the lease and charged them against its government contracts. When it charged $1,981 of the amortized amount against

contract F19628–79–C–001, the propriety of the charge was questioned and, in a final decision dated February 4, 1983, the contracting officer denied it as an allowable cost.

Riverside appealed to the Board which affirmed the contracting officer's decision. The Board reasoned that "Riverside did not incur the costs claimed for the improvements ... The contract and the [Defense Acquisition Regulations] permit reimbursement only for costs actually incurred." As to Riverside's argument that it gave up a valuable asset in return for the leasehold improvements and that it therefore incurred a cost which it should be permitted to amortize, the Board reasoned that "the leasehold ... at 80 West End Avenue, was not an asset ... and had no value."

## OPINION

This court's review of a decision of the ASBCA is limited by statute. Findings of fact by the Board may not be overturned unless those findings are found to be arbitrary, capricious, based upon less than substantial evidence, or rendered in bad faith. 41 U.S.C. § 609(b) (1982); *American Elec. Laboratories, Inc. v. United States*, 774 F.2d 1110, 1112 (Fed.Cir.1985). Decisions of the Board on questions of law are reviewable by this court for error. *Id.*

The Board determined that Riverside incurred no cost in the construction of improvements at the Newmark location and that therefore "there is nothing to charge against its government contracts." The Board erred by misinterpreting the definition of cost in the Defense Acquisition Regulations (DAR). *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed.Cir.1986) ("The interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve.") The Board's fundamental error was in concluding that the remaining term of Riverside's former leasehold interest was not an asset and had no value. In its decision the Board ignored the economic reality of the transaction at issue.

■ The DAR, which were incorporated into Riverside's contract with the government, define "costs" in DAR § 7–203.4(a) as follows:

the term *"costs"* shall include only those recorded costs which result, at the time of the request for reimbursement, from payment by cash, check, or *other form of actual payment* for items or services purchased directly for the contract, together with ... costs incurred, but not necessarily paid, for materials which have been issued from the Contractor's stores inventory and placed in the production process for use on the contract, for direct labor, for direct travel, for other direct inhouse costs, and *for properly allocable and allowable indirect costs*, as is shown by the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts.... (Emphasis added.)

Further, both the parties and the Board accepted the definition of "cost" as provided in Financial Accounting Concepts No. 3 (CON 3), issued by the Financial Accounting Standards Board:

*Cost* is the sacrifice incurred in economic activities—that which is given up or foregone to consume, to save, to exchange, to produce, etc. For example, the value of cash or other resources given up (or the present value of an obligation incurred) in exchange for a resource measures the cost of the resource acquired. Similarly, the expiration of future benefits caused by using a resource in production is the cost of using it.

The import of these provisions is that "cost" is equated with the amount a contractor forgoes or gives up, i.e., its economic sacrifice, to obtain goods or services. Thus the relevant inquiry is whether there was an economic sacrifice here by Riverside.

■ The Board found, and the parties do not dispute, that the improvements to the Newmark location were paid for by Warwick in return for the early surrender by Riverside of its leasehold rights at its former location and its legally enforceable agreement to vacate those premises. Therefore the value of the remaining term

of the lease owned by Riverside (together with the relatively minimal value of leasehold improvements at that location) is the economic sacrifice of Riverside.

Ordinarily property is valued at what an unrelated willing buyer is willing to exchange for it in a bona fide arm's-length transaction proximate in time. *See* 29 Am. Jur.2d *Evidence* §§ 395–399 (1967). Here, it is unnecessary to estimate the value of Riverside's remaining lease term of three and one-half years. For the termination of the lease and vacation of the premises, Riverside was first offered a payment of $1,000,000 by Warwick, the owner of the building. After further negotiations, an agreement was reached whereby the amount of the offer was increased and the form of the consideration was changed.[1] Under this new arrangement, it is apparent that the amount expended by Warwick on Riverside's behalf and the value of this property right (together with the nominal value of the improvements) was the consideration that Riverside gave up, or sacrificed, to acquire leasehold improvements at the Newmark location.[2]

The Board, however, did not accept this value because it found that "the leasehold ... at 80 West End Avenue [the former location], was not an asset under [Generally Accepted Accounting Principles] and had no value, or a negative value, except to Warwick." The Board reasoned that "the leasehold was not carried on [Riverside's] books as an asset and in the exchange it was treated as having no value since the 'gain' Riverside reported on its financial statement was not adjusted or reduced by any value assignable to the leasehold."

The Board's conclusion that there was no economic sacrifice because "Riverside accounted for the West End lease as an operating lease which had zero value, not as an asset" is unpersuasive. The Board found that Riverside's treatment of the lease "was consistent with generally accepted accounting principles related to lease accounting." The lease was not capitalized as an asset nor was a liability recognized for the associated lease payments. Instead, in accordance with standard accounting treatment for an operating lease, no asset or liability was shown on Riverside's balance sheet. This accounting convention, however, does not change the fact that Riverside had valuable property—the right to occupy the premises for the remaining term of the lease—which was used as the consideration (or cost) of acquiring the new

1. The Board observed as a factual matter that:
   Negotiations with Warwick continued. Eventually an agreement in principle was reached. In exchange for Riverside's agreement to terminate its lease some 3½ years before it expired, Warwick agreed to pay for Riverside's leasehold improvements at its new location at 330 West 42nd Street plus certain relocation costs. Riverside desired that Warwick perform its part of the bargain by cash payments direct to Riverside, but Warwick refused and insisted that Riverside enter into a contract with Flintlock Realty and Construction Company, Inc. (Flintlock) to construct the leasehold improvements. Flintlock was affiliated with Warwick and the available evidence indicates that they were commonly owned or controlled.

2. We disagree with the dissent that the price actually paid for the leasehold interest by Warwick in a bona fide arm's-length transaction is not indicative of the fair market value of the property interest. The cases cited by the dissent are inapposite. They hold only that when the government takes by eminent domain (i.e., where an actual sale has not occurred), a special value of the property to the owner will not be taken into account in determining just compensation. *Miller v. United States,* 620 F.2d 812, 825, 223 Ct.Cl. 352 (1980) (special value to the owner of old-growth redwood timber is not taken into account in determining just compensation); *United States v. 564.54 Acres of Land,* 441 U.S. 506, 511, 513, 516, 99 S.Ct. 1854, 1857, 1858, 1859, 60 L.Ed.2d 435 (1970) (just compensation for the taking of summer camps is adequately determined by factors such as the "recent sales of comparable facilities in the vicinity" and not the owner's "unique need for the property"). Moreover, it is apparent that a willing buyer "being reasonably informed as to all relevant facts," including the fact that Warwick would pay more than a million dollars to acquire the leasehold estate at the date of valuation, would not place a zero value on the lease, even though its value solely for purposes of occupancy might be zero.

   Contrary to the dissent's characterization of the testimony of Riverside's expert, he determined that "there was a clear indication of value ... (i.e., the leasehold improvements at 330 West 42nd Street [the Newmark location] )" for the leasehold right given up by Riverside. 87–2 BCA ¶ 19,693 at 99,704.

leasehold improvements. The Board's conclusion that Riverside incurred no cost appears to be based on the erroneous assumption that a property interest can have value only if that value is reflected on the balance sheet.

Further corroboration that Riverside's property interest had value are the Board's findings that Riverside's "financial statement shows an *increase* in its 'Research Facilities, Equipment, and Furniture' account and an *increase* in its 'Fund Activity' account" by an entry for "Gain on termination of lease." Riverside thus recognized that it had gain on disposition of the leasehold estate to Warwick and that an equivalent amount was expended as a cost to obtain leasehold improvements in its new location.

The Board also erred in relying on *Marquardt Co. v. United States*, 822 F.2d 1573 (Fed.Cir.1987), and viewing this transaction as an attempt by Riverside to convert " 'an expenditure by a third party into a "cost" incurred by itself.' " *Id.* at 1577 (quoting *The Marquardt Co.*, 86–3 BCA ¶ 19,100 at 96,549 (ASBCA 1986)). *Marquardt* stands for the unexceptional proposition that a cost may not be charged against the government unless that cost is actually incurred by the contractor. Marquardt was a subsidiary company whose stock was sold by its parent to another corporation. *Id.* at 1574. Marquardt attempted to write up the cost basis of its assets to reflect the acquiring corporation's cost of the Marquardt stock and then charge depreciation computed on the increased cost basis against its existing government contracts. *Id.* This court held that such charges were not allowable because Marquardt had not incurred any additional costs with respect to its assets. Moreover, Marquardt's assets remained exactly the same. *Id.* at 1580.

In this case, however, there was a change in Riverside's assets—its leasehold estate and leasehold improvements at its former location were disposed of and leasehold improvements at the Newmark location were acquired. The change occurred as the result of an exchange of properties, but this is no reason to treat the transaction as if there had been no change of assets. Unlike *Marquardt,* therefore, Riverside was not attempting to write up the cost basis of old assets. The increased cost it reflected was for newly acquired assets.

We thus conclude that Riverside did incur a cost to acquire the leasehold improvements at the Newmark location, which is properly amortizable by Riverside against its government contracts.[3]

## COSTS

Costs to Riverside.

REVERSED.

MAYER, Circuit Judge, dissenting.

For a reason of its own the landlord, Warwick, wanted Riverside to terminate its lease three and a half years early. So it agreed to pay Riverside's moving expenses and says it paid about $1.7 million to an affiliated company it owned and controlled to make leasehold improvements at Riverside's new location. Riverside ended up at a new building, with better facilities, a longer lease, and a lower rent; all in all, a bonanza. Now this court says the government must pay Riverside again for the "cost" of the leasehold improvements. This, despite the fact that Riverside paid no money and gave up nothing of value for the improvements.

The fundamental flaw is in equating Riverside's "cost" for the leasehold improvements with what Warwick was willing to pay as an inducement for Riverside to move. What it "cost" Riverside is entirely unrelated to how much Warwick was willing to spend to get Riverside out of its building. The focus must be on what the improvements cost Riverside—nothing, ex-

3. We note that Riverside erred in attempting to amortize $2,573,074, which it arrived at by subtracting from its estimate valued of the leasehold improvements ($2,750,000) the unamortized value of the old improvements, plus other directly related moving costs (in total, $177,000). The $177,000 figure should have been subtracted from the amount Warwick paid, the latter being the "cost" of the improvements.

cept for the vestiges of unamortized improvements at the old location—not on what they cost Warwick. Riverside had the contract with the government.

The result here is in direct conflict with *Marquardt Co. v. United States*, 822 F.2d 1573 (Fed.Cir.1987), in which a contractor was acquired by another company and attempted to charge that company's acquisition costs against its government contracts. We said that the threshold requirement for allowability is that a cost actually be incurred by a contractor; because the acquisition costs had been incurred by the acquiring corporation, the contractor could not charge those costs against its government contracts. *Id.* at 1577. The same principle applies here. Riverside simply has no right to convert "an expenditure by a third party into a 'cost' incurred by itself." 822 F.2d at 1577 (quoting *Marquardt*, 86–3 BCA ¶ 19,100 at 96,549).

All agree that "cost" is the extent to which a contractor makes an economic sacrifice to obtain goods or services. Moreover, there is no dispute that the only thing Riverside sacrificed was its right to remain at the West End location until the imminent end of its lease. The question is how to value that vestigial right.

The record is replete with evidence that the remainder of the lease had a zero—or even negative—fair market value. Riverside's own expert, a managing partner with Arthur Anderson, said he did not even attempt to appraise the value because a lease "with 3½ years remaining on its term in a rather poor commercial area in New York City ... didn't seem to have any 'substance of value....' " 87–2 BCA ¶ 19,693 at 99,-704. In fact, evidence before the Board showed that if Riverside had been able to sublet the Warwick premises "it would have received a rental substantially less than the existing rental," and suffered a net loss in excess of $1 million. No one is going to relieve it of its lease for a return like that. So, the fair market value of the remainder of the lease was zero, *see United States v. Petty Motor Co.*, 327 U.S. 372, 381, 66 S.Ct. 596, 601, 90 L.Ed. 729 (1946),

and Riverside incurred no "cost" in giving it up.

But the court concludes that the fair market value of Riverside's West End leasehold was $1.7 million because Warwick was willing to spend that much to repossess it. "Fair market value is generally defined as 'the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts.' " *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1054 n. 3 (Fed.Cir.1983) (quoting *Miller v. United States*, 620 F.2d 812, 825, 223 Ct.Cl. 352 (1980)). It is not measured by a property's "special value" to a particular individual. *Miller*, 620 F.2d at 825; *see United States v. 564.54 Acres of Land*, 441 U.S. 506, 511, 99 S.Ct. 1854, 1857, 60 L.Ed.2d 435 (1979). The remainder of the lease had a "special value" to Warwick because it owned the building and was under "compulsion" to get Riverside out so it could close a contract to sell the building for more than $9 million, which it did three days later. The price Warwick was willing to pay for the lease does not measure its fair market value. The fair market value was the price a willing buyer on the open market would pay, nothing.

That Riverside had to give up its right to the improvements at its old location also does not transform the transaction with Warwick into an economic sacrifice. Riverside did not own the West End improvements; it does not now own the improvements at the new location. "The economic substance of the exchange ... [was] a physical move by Riverside from one location to another with no out-of-pocket expense to itself and an exchange of leasehold improvements." 87–2 BCA ¶ 19,693 at 99,715.

This imaginative scheme to amortize the improvements against its government contracts allows Riverside to have its cake and eat it too: Warwick pays for the improvements; the government pays Riverside. But this is akin to the kind of double recovery precluded by *Blue Cross Ass'n v. Unit-*

*ed States,* 568 F.2d 1339, 215 Ct.Cl. 400 (1978). In that case, insurers wanted to charge state franchise taxes against their government contracts, but were disallowed because they had already recouped the tax through the rates charged non-government policyholders. They had "already extracted the [franchise tax] from their policy holders and [could] not now extract it a second time from the Government." *Id.* at 1341. Likewise here, Warwick paid for the leasehold improvements to Riverside's profound benefit. Riverside should not now be allowed to "extract this cost a second time from the Government."

Finally, a contractor's own treatment of an event, reflecting its "practical interpretation of the contract ... at a time when it was not a subject of controversy, is entitled to great, if not controlling, weight." *Inland Empire Builders, Inc. v. United States,* 424 F.2d 1370, 1378, 191 Ct.Cl. 742 (1970); *see Blanchard v. United States,* 347 F.2d 268, 273, 171 Ct.Cl. 559 (1965). By Riverside's own accounting treatment, the transaction with Warwick was recognized as a financial windfall, not an economic sacrifice.