**Donald H. RUMSFELD, Secretary of Defense, Appellant,**

v.

**UNITED TECHNOLOGIES CORPORATION, Pratt & Whitney, Appellee.**

**No. 02–1071.**

United States Court of Appeals, Federal Circuit.

Jan. 15, 2003.

Patricia M. McCarthy, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellant. With her on the brief were Robert D. McCallum, Jr., Assistant Attorney General; and David M. Cohen, Director. Of counsel on the brief were William F. Reyes, Special Counsel, Office of General

Counsel, Department of Defense, of Washington, DC; Stephen R. Dooley, Acting Chief Trial Attorney; and Kathleen P. Malone, Trial Attorney, Defense Contract Management Agency, of Boston, MA.

Kent R. Morrison, Crowell & Moring LLP, of Washington, DC, argued for appellee. With him on the brief were Roger N. Boyd, George D. Ruttinger, and Parul P. Desai. Of counsel on the brief was Paul L. Robert, Associate General Counsel, United Technologies Corporation, of Hartford, CT.

Before NEWMAN, LOURIE, and DYK, Circuit Judges.

DYK, Circuit Judge.

The Secretary of Defense ("the government") appeals from the July 30, 2001, decision of the Armed Services Board of Contract Appeals ("Board") in favor of United Technologies Corp., Pratt & Whitney ("Pratt"). *Appeals of United Techs. Corp., Pratt & Whitney*, ASBCA Nos. 47416, 50453, & 50888, 01–2 BCA ¶ 31,592 (July 30, 2001). The Board found that payments made to Pratt's foreign suppliers to acquire parts under "collaboration agreements" were not "costs" for purposes of calculating indirect cost pool (overhead) allocation bases under the Cost Accounting Standards (CAS). *Id.* at 1. Because we conclude that Pratt did incur a "cost" for collaboration parts, we vacate and remand for further proceedings.

## INTRODUCTION

The facts underlying this case are complex, but are virtually undisputed by the parties. During the period from 1984 to 1996 Pratt had a number of cost plus contracts with the government. These contracts incorporated the Cost Accounting Standards.[1] Pratt also had a number of commercial engine contracts.

Under the government contracts Pratt was reimbursed both for allowable direct and indirect costs that were allocable to the government contracts. We have discussed the differences between allowability and allocability in our decision in *Boeing North American, Inc. v. Roche*, 298 F.3d 1274, 1280 (Fed.Cir.2002), where we noted that "[a]llocability is an accounting concept involving the relationship between incurred costs and the activities or cost objectives (*e.g.*, contracts) to which those costs are charged.... The concept of cost allowability concerns whether a particular cost can be recovered from the government in whole or in part." Allowable direct costs are directly reimbursed if the particular cost is allocable to a government contract. *See id.* The allocation of indirect costs pursuant to CAS is more complex.

Allowable indirect costs must be allocated according to a base comprised of direct costs, so that each dollar of direct costs in the base bears the same amount of indirect costs. Indirect costs include overhead, which is calculated by grouping the costs that cannot be directly allocated (here to a particular government contract or commercial engine contract). Under CAS, the overhead pool (*i.e.*, the aggregated indirect costs)· may then be allocated across contracts and programs using the "material costs" associated with each contract or program as the basis for allocation. CAS 418–50. The larger the total material costs associated with a contract, the greater its share of the overhead pool. It is therefore in the government's interest to maximize the amount of material costs associated with commercial contracts in order to increase the value of the commercial program's portion of the overhead pool and inversely decrease the government's share of overhead; and it is in Pratt's

---

1. Codified at 48 C.F.R. § 9903–05 (2002).

interest to minimize the commercial program material costs, decrease the value of the commercial program's portion of the overhead pool and increase the government's share of overhead.

The dispute here concerns whether amounts paid to acquire certain "collaboration parts" for commercial engine programs constituted "material costs" under CAS that should have been included in the programs' allocation bases used to allocate overhead. The government argues that these amounts were "costs" that should have been included; Pratt argues that the amounts were not "costs" and that they were correctly excluded. The consequences of inclusion or exclusion are allegedly considerable, amounting to $250,000,000 (including interest), according to the government's calculation.

## BACKGROUND

### A. Pratt's Collaboration Agreements

The parts in question were produced for Pratt by foreign parts suppliers for three commercial aircraft engines (the PW2000, PW4000, and JT8D–200 engines) pursuant to "collaboration agreements" between Pratt and these foreign parts suppliers beginning in 1977. The PW2000 engine program (originally named the JT10D engine program), which was representative in all relevant aspects of the three engine programs, included collaboration agreements between Pratt and Motoren-und Turbinen–Union Muenchen GmbH (MTU) of Germany and Fiat Aviazione Societa Per Azioni (Fiat) of Italy, dated July 12, 1977. Pratt had similar agreements for the PW4000 and JT8D–200 engine programs with other foreign parts suppliers.

Pratt was the only entity that had a direct contractual relationship to the purchasers of the engines. The foreign parts suppliers had no direct relationship to the purchasers. However, under the collaboration agreements between Pratt and each

parts supplier there was a complicated agreement that involved substantial risk sharing. Pratt did not pay a preset price for the collaboration parts. Instead, under the agreements, each collaborator was assigned a percentage share of the engine program ("program share"). Substantially all of the collaboration agreements required each collaborator to pay to Pratt a substantial up-front "program entry fee" directly related to its program share. The collaborator was to receive its program share of the revenues derived from the engine sale by Pratt "in consideration of the parts manufactured." *United Techs.*, 01–2 BCA ¶ 31,592, at 15 (citation omitted). The collaborator was to supply parts with an "equivalent engine value" based on its "Manufacturing Target Cost" (MTC), *i.e.*, parts with a particular combined value in relation to the total value of the engines produced by Pratt (the relative value of the parts being equal to the program share). The MTC of a part was "the estimated cost of each part if Pratt were to manufacture the part." (Appellee's Br. at 6 n. 3.) The collaborators also shared in certain costs that Pratt incurred for the engine programs, because a fee called "Drag" was subtracted from their revenue shares, the Drag representing Pratt's "disproportionate program expenses," which include "overhead for the program management and administration, marketing and sales, product support, material handling, and other administrative functions." *United Techs.*, 01–2 BCA ¶ 31,592, at 14. The amount of "Drag" was based on a negotiated agreement between Pratt and each collaborator. The express language of the collaboration agreements also provided that the relationship between Pratt and the foreign collaborators was that of independent contractors and not as partners. *Id.* at 16.

The collaboration parts were used by Pratt either directly to construct engines

or as spare parts. The name of the form used by Pratt to request the parts was "purchase order." *Id.* at 13. The Board described Pratt's treatment of the collaboration parts by Pratt as follows:

> [The] parts ... are ... received, stored and moved through the Manufacturing Division (MD), like other purchased parts (R4, tab 307 at 2515). The collaboration parts are intermingled with and are not segregated from Pratt's other purchased and manufactured parts (R4, tab 407 at ¶ 4).

*Id.* After the parts were received by Pratt, "[t]he collaboration agreements provide[d] that title to the parts furnished to Pratt remain[ed] with the collaborator until the parts [were] delivered to [an engine or spare part] customer." *Id.* According to the collaboration agreements, title to the parts was transferred to Pratt immediately prior to delivery. Thus, Pratt became the owner of the parts before delivery in order to pass title of the engine or spare part to the engine or spare part customer.

The collaboration agreements included a number of other risk sharing aspects not generally found in contracts for the acquisition of materials. Examples of these risk sharing aspects included: sharing in the risk that the engine program would lose money; sharing in the administrative expenses for the engine programs; sharing in price discounts and rebates to customers; sharing in liability to third parties; and sharing the risk that due to a change in circumstances, *e.g.*, a redesign of the engine, the equivalent engine value of the parts produced by another collaborator might change, altering the percentage share of the parts contributed by the collaborator and therefore its program share.

Pratt also acquired engine parts under subcontractor agreements with parts suppliers that were both more traditional and less complex. Pratt agreed to purchase parts from these suppliers for a fixed price per part, and took title on the delivery of the parts.

### B. Cost Accounting Standards

Many government contracts, like the government contracts here, are structured as "cost-reimbursement" contracts, requiring the government to reimburse the contractor for "allowable" costs incurred to perform the contract. As noted above, costs are characterized by both their allowability (whether the government is required to reimburse the costs) and allocability (whether the costs are to be allocated directly to a final cost objective, or indirectly among a number of cost objectives). As previous decisions of this court have made clear, the Federal Acquisition Regulations (FAR) govern allowability, and CAS governs allocability of costs. *See Boeing,* 298 F.3d at 1280.

The CAS comprise a set of rules promulgated by the Cost Accounting Standards Board (CASB) that regulate the accounting practices of government contractors. *See id.* at 1282–83. While CAS did not directly cover Pratt's commercial engine contracts, CAS dictated the accounting treatment of Pratt's commercial contracts in relation to its government contracts.

The CAS rules provide for the allocation of a government contractor's direct and indirect costs. While direct costs generally can be allocated to a particular program or contract, a problem arises in how to allocate indirect costs, for example, general and administrative (G & A) expenses (overhead), which "represent the cost of the management and administration of the business unit as a whole." CAS 410–20. These overhead expenses are to be distributed across the corporation's business. Where, as here, there are non-government contracts (*i.e.,* the commercial engine programs), it is still necessary that the engine programs support their share of the overhead expenses.

Pratt allocated its G & A expenses to cost objectives using direct material cost as its allocation basis, *i.e.*, as the representation of the activity associated with a cost objective. Thus, a cost base calculated using direct material costs aggregated the "costs" of all materials used in performing the project. For the PW2000 engine program (which the parties have agreed is representative) Pratt treated parts purchased from traditional parts suppliers as having a "material cost," but treated parts acquired under "collaboration agreements" as having no direct "material cost" associated therewith, and were excluded by Pratt from the material cost bases associated with the PW2000 program. The effect was to exclude 16.8% of the parts in the PW2000 engine program from the cost base. Without a material cost associated therewith, no portion of the G & A (overhead) pool was allocated by Pratt to the collaboration parts. This was accomplished in the following manner for internal accounting:

> [Upon sale of an engine or spare part] Pratt ... debits accounts receivable and credits sales for the amount of the sale. However, Pratt immediately debits sales for the collaborators' share of the revenue, and credits a "contra receivable" account in the same amount.... When cash is collected from a customer, Pratt debits cash and credits accounts receivable for the amount of the payment, and then debits contra receivable and credits cash for distributions to the other collaborators of their net revenue shares.... Thus, the net amount of sales and revenue due shown on Pratt's books is only Pratt's share.

(Appellee's Br. at 11–12) (emphasis in original).

From the inception of the collaboration agreements until July 2, 1996, after this dispute arose, Pratt treated its payment to collaborators differently for public financial statement purposes. For that purpose, Pratt treated the payments as a "cost of sales." Cost of sales represents the cost to the seller of the products sold. After this dispute arose in 1996, Pratt issued a public statement stating that the revenue shares would instead be treated as a reduction of gross sales, using Pratt's internal accounting methodology. This accounting change meant that for financial statement purposes the collaboration parts would no longer have an associated cost.

### C. Prior History and Proceedings

The present dispute began more than ten years ago. On January 24, 1992, a contracting officer of the Defense Logistics Agency issued a Final Finding of Noncompliance to Pratt. The contracting officer found that:

> [Pratt's] cost accounting practices with regard to commercial "collaboration" agreements are not in compliance with Cost Accounting Standards (CAS) 418—Allocation of direct and indirect costs, 410—Accounting of business unit general & administrative expenses (G & A) and 420—Accounting for independent research and development costs and bid and proposal costs (IR & D/B & P).

(J.A. at 3855.) The specific basis for the finding of noncompliance was Pratt's failure to "include[ ] an appropriate measure of the cost of parts consigned by the collaborating partners in the expense allocation bases." *Id.* at 3856. The contracting officer required Pratt to use the revenue share attributable to collaboration parts as a cost for CAS accounting purposes for the accounting period from January 1, 1984, to January 24, 1992. This first decision did not quantify the amount determined to be owed by Pratt. Pratt appealed this decision to the Board.

On December 2, 1996, another contract officer of the Defense Logistics Agency

issued a final decision of noncompliance for the "period 1984 through 1995, based upon Pratt's alleged noncomplaince with CAS 410, 418, and 420." *United Techs.*, 01–2 BCA ¶ 31,592, at 2. This decision incorporated the earlier decision, but covered a longer period than that decision and also quantified the amount determined to be due. The second contract officer found that the "collaborators [were] in essence subcontractors or vendors to [Pratt]." (J.A. at 4837.) This was based on the contract officer's determination that: like subcontractors, the collaborators transferred title to the parts in exchange for payments (in the form of revenue share); the agreements themselves specified that no partnership was created; Pratt unilaterally set the sales price; and Pratt accounted for the revenue shares as "cost of sales" for financial and tax purposes. The contract officer demanded repayment totaling $157,593,610 plus interest of $102,696,501. This decision was appealed to the Board.[2]

The two pending appeals were consolidated before the Board. The government urged that the form of the transaction governed and that the transaction was legally a purchase by Pratt from a subcontractor. Pratt, on the other hand, argued that CAS did not define "cost"; that under such circumstances GAAP was properly interpreted as a supplement to CAS; that, under GAAP, the substance rather than the form of the transaction governed; and

that the transactions were in substance either joint ventures or consignments. Pratt presented expert witnesses as to the meaning of CAS.

On the GAAP issue, both parties again presented expert witnesses. These witnesses differed as to whether substance over form was in fact a GAAP requirement. They also differed as to when substance over form should govern and as to the appropriate characterization of the "substance" of the particular transactions. Pratt's witnesses urged primarily that the transactions were properly characterized as joint ventures. Pratt called two expert witnesses on GAAP accounting, Charles Horngren and David Teece. Professor Horngren testified that the proper accounting treatment was to determine where on a spectrum or continuum of relationships the collaboration agreements fell based on seventeen identified factors.[3] He described a continuum between prime-subcontractor transactions and partnerships. Similarly, Professor Teece described a spectrum of relationships from arms length transactions to intra-firm transactions, including a "middle territory ... refer[red] to as strategic alliances or collaborative arrangements." (Tr. 6–21.) He applied four factors to distinguish between the different relationships, though he admitted that "[t]here's no easy [sic] to quantify metrics that can be applied in each case, but I believe that there are basic thresholds that exist [in defining the four factors]...." (Tr. at 6–20.)[4] Although he

---

**2.** A third appeal was also taken to the Board and was assigned appeal number 50888. The Board denied that appeal, *United Techs.*, 01–2 BCA ¶ 31,592, at 55–56, and Pratt has not appealed that decision to this court.

**3.** Professor Horngren testified on how he selected seventeen factors for characterizing transactions as follows:

I started with the GAO—I can't remember the number that they cited. But there were several. And then, I added my own, based

on my own knowledge of management accounting, and general characteristics that you worry about as an accountant, as to how you're going to portray a series of events, transactions, and relationships. (Tr. at 7–64.)

**4.** The Board characterized the methodology used by Professor Teece as follows:

He used the following four umbrella "dimensions of interfirm relationship" which he had "distilled" from the literature in his

recognized that express provisions of the collaboration agreements distinguished them from partnerships, Professor Teece testified that "[t]he formal structure [of a relationship] is not fundamentally material to my analysis. What is material to my analysis is the incentive structures and the fundamental economic relationships that are defined by the contract." (Tr. at 6–40.)

On July 30, 2001, the Board issued its decision holding that Pratt did not incur a "cost" for collaboration parts, and that, therefore, its accounting practices did not violate CAS. *United Techs.*, 01–2 BCA ¶ 31,592, at 52. The Board first determined that CAS did not provide a definition for "cost," and that therefore, GAAP could be used to resolve the issue. *Id.* at 45. The Board accepted Pratt's expert's testimony that under GAAP the "economic substance" of the collaboration agreements rather than their form should control, and specifically chose to "adopt the approach espoused by Professor Horngren." *Id.* at 47–49.

After accepting the "substance over form" argument, the Board proceeded to find that the agreements were more properly analogized to "joint ventures" or "consignments" than to subcontractors (as argued by the government). *Id.* at 49–50. In reaching this conclusion, the Board made subsidiary findings that "title remains with the collaborators" and that "the price of the parts is neither fixed nor determinable at the time of delivery and payment is contingent upon Pratt's sale to the customer." *Id.* at 50–51. The Board distinguished the collaboration agreements from supplier subcontracts based, in part, on the sharing of program risk and benefits. *Id.* at 45–48. The Board instead found that the collaboration agreements comprised a form of "collaborative partnering" and discounted the government's reliance on an express contract term referring to the collaborators as "independent contractors." *Id.* at 46–49.

The Board rejected Pratt's argument that a February 8, 1991, settlement agreement between Pratt and the government had resolved the issue of Pratt's CAS compliance. *Id.* at 54.[5] Finally, the Board did not reach "Pratt's lengthy estoppel defense" based on its conclusion that no cost had been incurred. *Id.* at 53.

The government timely filed this appeal.

## DISCUSSION

### I

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(b) and 41 U.S.C. § 607(g)(1)(B). The standard of review applied to Board decisions is prescribed by statute, which provides:

[T]he decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such

---

analysis of the collaboration agreements: (1) the contractual and administrative structure of the arrangement; (2) the exchange of information, resources and capabilities that result in learning; (3) the distribution of risk; and (4) the willingness to accommodate change, avoid and resolve disputes.... His evaluation involved a continuum or transaction spectrum in which transactions at one end take place within a vertically integrated or multi-divisional firm and at the other end are purely arm's length between two firms in a market.... In Dr. Teece's view, strategic alliances and subcontracts are mutually exclusive for a given set of transactions.
*United Techs.*, 01–2 BCA ¶ 31,592, at 38.

5. This issue is not raised on appeal.

decision is not supported by substantial evidence.

41 U.S.C. § 609(b) (2000); *Rice v. Martin Marietta Corp.*, 13 F.3d 1563, 1568 (Fed. Cir.1993).

## II

■■■ The issue in this case is whether CAS required Pratt to include a "cost" for collaboration parts in its allocation bases used to allocate overhead. Resolution of this question requires us to interpret CAS. Contrary to the Board's approach, the central issue we confront—the interpretation of CAS—is an issue of law, not an issue of fact, as we have made clear in our prior decisions. *Martin Marietta*, 13 F.3d at 1568; *see also Gen. Elec. Co. v. Delaney*, 251 F.3d 976, 978 (Fed.Cir.2001) ("federal procurement law, [and] the board's conclusions of law, such as the meaning of a regulation or statute, are reviewed *de novo*"); *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed.Cir.1986) ("The interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve."). The views of the self-proclaimed CAS experts, including professors of economics and accounting, a former employee of the CAS Board, and a government contracts accounting consultant, as to the proper interpretation of those regulations is simply irrelevant to our interpretive task; such evidence should not be received, much less considered, by the Board on the interpretive issue. That in-

terpretive issue is to be approached like other legal issues—based on briefing and argument by the affected parties.[6]

CAS 410, which is entitled "Allocation of business unit general and administrative expenses to final cost objectives," provides in relevant part: "The cost input base used to allocate the G & A expense pool shall include all significant elements of that cost input which represent the total activity of the business unit." CAS 410–50(d). "Cost input" is defined as "the cost, except G & A expenses, which for contract costing purposes is allocable to the production of goods and services during a cost accounting period." CAS 410–30(a)(3). Pratt elected to use a form of total cost input accounting based on "material costs" as provided by CAS 418–50(d)(2)(iv).[7] Having chosen a base composed of "material costs," "all significant elements" of the cost of the materials used to carry out the final cost objectives (contracts or programs) were *required to be included*. CAS 410–50(d).[8]

■■■ Thus, CAS mandated the use of "costs," here "material costs" in particular, in the base used to allocate indirect expenses. In order to determine whether Pratt incurred a "cost" or "material cost" for the collaboration parts, it is first necessary to determine the meaning of the terms "cost" and "material cost." Despite the ubiquitous use of the word "cost" throughout CAS, CAS does not provide a definition for the terms "cost" or "material

---

**6.** Testimony as to the requirements of GAAP is another matter; the Board could properly consider expert testimony on such an issue.

**7.** CAS 418 entitled "Allocation of direct and indirect costs" provides in relevant part:

The base used to represent the activity being managed or supervised shall be determined by the application of the criteria below. All significant elements of the selected base shall be included....

(iv) *A material cost base* is appropriate if the activity being managed or supervised is a material-related activity.

CAS 418.50(d)(2) (emphasis added).

**8.** In addition to G & A allocation, independent research and development (IR & D) and bid and proposal (B & P) cost allocation under CAS 420 are also at issue here. In accordance with CAS 420 Pratt chose to allocate these costs using the same bases as it used for G & A allocation.

cost." *See* CAS 301; John Cibinic, Jr. & Ralph C. Nash, Jr., *Cost–Reimbursement Contracting* 638 (2d ed.1993).[9] We initially turn, therefore, to standard dictionary definitions and other pertinent regulations. *See, e.g., Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.,* 505 U.S. 214, 223, 112 S.Ct. 2447, 120 L.Ed.2d 174 (1992). Given that "material cost" is involved, the pertinent definition of "cost" is "an item of outlay incurred in the operation of a business enterprise (*as for the purchase of raw materials, labor, services, supplies* ) including depreciation and amortization of capital assets." *Webster's Third New International Dictionary* 515 (1968) ("*Webster's* ") (emphasis added).[10] There is no suggestion that the accounting source references use a materially different definition. Indeed, the parties before the Board agreed on a definition of "cost" as "the sacrifice incurred in economic activities that which is given up or forgone to consume, to save, to exchange, to produce." *United Techs.,* 01–2 BCA ¶ 31,592, at 7, 51 (quoting FASB Concepts Statement No. 6, n. 19). We have indeed approved the use of a similar definition of "cost" under earlier procurement regulations, stating that " 'cost' is equated with the amount a contractor forgoes or gives up, i.e., its economic sacrifice, to obtain goods or services." *Riverside Research Inst. v. United States,* 860 F.2d 420, 422 (Fed.Cir.1988) (citing FASB Concept Statement No. 3, which provides "[c]ost is the sacrifice incurred in economic activities—that which is given up or foregone to consume, to save, to exchange, to produce, etc.").

In addition to dictionary definitions, clarity in the term "cost" as used in CAS may also be provided in related regulations, such as FAR. FAR provides the general regulatory scheme for contracts with the federal government and "[the] policies and procedures for applying the

---

**9.** CAS does include definitions for a number of relevant terms as follows:

(1) *Allocate* means to assign an item of cost, or a group of items of cost, to one or more cost objectives. This term includes both direct assignment of cost and the reassignment of a share from an indirect cost pool.

(2) *Cost objective* means a function, organizational subdivision, contract, or other work unit for which cost data are desired and for which provision is made to accumulate and measure the cost to processes, products, jobs, capitalized projects, etc.

(3) *Direct cost* means any cost which is identified specifically with a particular final cost objective. Direct costs are not limited to items which are incorporated in the end product as material or labor. Costs identified specifically with a contract are direct costs of that contract. All costs identified specifically with other final cost objectives of the contractor are direct costs of those cost objectives.

(4) *Final cost objective* means a cost objective which has allocated to it both direct

and indirect costs, and in the contractor's accumulation system, is one of the final accumulation points.

(5) *Indirect cost* means any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective.

(6) *Indirect cost pool* means a grouping of incurred costs identified with two or more cost objectives but not specifically identified with any final cost objective.

CAS 402–30 (italics in original).

**10.** Similarly Random House defines "cost" as *"the price paid to acquire,* produce, accomplish, or maintain anything … an outlay or expenditure of money, time, labor, trouble … to require the payment of (money or something else of value) in an exchange." *Random House Webster's Unabridged Dictionary* 457 (1998) (emphasis added). The Oxford English Dictionary defines cost as "[t]hat which must be given or surrendered in order to acquire, produce, accomplish, or maintain something; the price paid for a thing." 3 *Oxford English Dictionary* 988 (2d ed.1989).

Cost Accounting Standards Board (CASB) rules and regulations ... to negotiated contracts and subcontracts." 48 C.F.R. § 30.000 (2001); *see also* Lane K. Anderson, *Accounting for Government Contracts Cost Accounting Standards* § 1.06 (2002). Thus, the usage of the word "cost" in FAR is instructive of its usage in CAS. The definitions section of FAR defines "material costs" as "includ[ing] ·the costs of such items as raw materials, parts, sub-assemblies, components, and manufacturing supplies, whether *purchased or manufactured* by the contractor, and may include such collateral items as inbound transportation and intransit insurance." 48 C.F.R. § 31.205-26 (2001) (emphasis added).

Thus, both standard dictionaries and FAR define "cost" or "material cost" to include the outlay for materials "purchased." The standard dictionaries do not define "purchase" with any precision.[11] Nor does the FAR or CAS itself. However, in addition to dictionaries, this court has recognized that the Uniform Commercial Code (U.C.C.) is useful for determining "the ordinary commercial ·meaning of terms." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047–48, 59 USPQ2d 1121, 1126 (Fed.Cir.2001) (citing *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1382, 47 USPQ2d 1725, 1729 (Fed.Cir.1998)). In· order to determine whether there has been a purchase, we look to see whether there has been a "sale" by the parts suppliers to Pratt.

The U.C.C. defines "sale" as *"the passing of title from·the seller to the buyer for·a price."* · U.C.C. § 2–106 (1989) (emphasis added). The point in time when title passes may be defined by explicit agreement of the parties. U.C.C. § ·2–401(2) (1989). Contrary to the Board's finding that "Pratt does not take title to the collaboration parts,"· *United Techs.*, 01–2 BCA ¶ 31,592, at 50, Pratt's witness confirmed that "[t]itle, as far as Pratt & Whitney is concerned, in order to be able ·to convey title to the engine when it sells it to the customer, that is an·instantaneous passage of title from the collaborators to Pratt & Whitney at that· moment or instant in time, if you will." (Tr. at 4–103–04.) Thus, there is no question but that Pratt does obtain title to the parts.

■ Further, Pratt paid a "price" ·for the parts. It became bound by the obligation to pay the collaborators' ·share of revenue just prior to its transfer of ·parts to a purchaser. The Board noted that all of the collaboration agreements save one "provide[d] that the sharing of gross reve-· nues from the sale of engines and parts will be *'in consideration of* the parts manufactured.' " *United Techs.*, 01–2 BCA ¶ 31,592, at 15 (emphasis added). The contracts also expressly linked the receipt of revenue share payments to the delivery of a collaborator's program share of production.[12] The fact that a particular revenue share was not assigned as a matter of internal accounting to individual parts and that the revenue share per part during any

---

**11.** Webster's, for example, defines "purchase," in relevant part, as "to obtain (as merchandise) by paying money or its equivalent: buy for a price." *Webster's* at 1844.

**12.** Examples of the contract language incorporating this requirement include: "[t]he parties recognize that such sharing of revenues is acceptable only if [the collaborator] produces and delivers its Program Share ·of production" (J.A. at 7570); "[t]he parties agree that

any sharing of revenues is conditional upon Collaborator's delivery of Parts in accordance with section 4" (J.A. at 7706); "[t]he parties recognize that ·such sharing of revenues is acceptable only if the parties produce and deliver their Program Share of production" (J.A. at 7508); and "[a]s a general principle, the parties recognize that such sharing of revenues is acceptable only if [the collaborator] delivers its Program Share of production" (J.A. at 7302).

particular time period might have been greater or lesser depending on a variety of factors did not prevent the payments from constituting a price. Thus, the transactions constituted a sale, wherein title passed from the foreign collaborators to Pratt and Pratt became obligated to pay a price to the foreign collaborators representing the revenue share.[13] The express language of Pratt's contracts, which make clear that the parts suppliers are "independent contractors" of Pratt, supports this conclusion.[14] In short, we find the terms "cost" and "material cost" as used in CAS to be clear and unambiguous, and to include the revenue share payments made by Pratt for the parts under the collaboration agreements.

■ Indeed a contrary result would be difficult to square with the overall purpose of CAS. The use of costs for allocation bases under CAS is predicated on the concept of costs' being representative of "the activity being managed or supervised." CAS 418–50(d)(2). Thus, it is important that "all significant elements of the selected base ... be included." *Id.* In order for the material cost base provided by CAS

418–50(d)(2)(iv) to be representative of the activity to which those costs are directed (*i.e.,* the beneficial or causal relationship between the indirect cost pool and the benefiting cost objective), it is clear that in general the cost input must represent the entire cost input. Thus, the CAS requirement that costs represent the activity being performed requires that the cost of the collaboration parts be accounted for in distributing indirect costs to final cost objectives. Excluding this significant element from the calculation of overhead allocation bases would cause a substantial distortion in overhead allocation.

### III

■ However, Pratt urges that we should not focus on whether Pratt, as a technical matter, "purchases" the parts, but rather on the "economic substance" of the transaction, which it argues was in economic substance a joint venture between Pratt and the foreign collaborators rather than a sale from the parts suppliers to Pratt. Pratt does not (and could not) argue that the collaboration agreements formed legal entities comprising joint ven-

---

13. CAS provides that the pertinent time for measuring the amount of cost is the time of production. *See* CAS 410.30(a)(3) (defining "[c]ost input [as] the cost, except G & A expenses, which for contract costing purposes is allocable to *the production of goods and services*") (emphasis added). Indeed, the CAS Board rejected a proposal to use "cost of sales" for cost allocation because "[t]he use of a cost of sales base can result in unwarranted shifting of costs between different types of final cost objectives." 41 Fed.Reg. 16,136 (Apr. 16, 1976). "Cost of sales is the amount that represents the cost [to the seller] of products sold in a particular period." (Tr. 9–151.) Thus, the CAS Board rejected using the cost to the seller of products sold "in a particular time period" as an allocation base, and instead required that the "input cost" (the cost at the time of production) be used in the allocation base. The cost of a part thus must be measured as of the time it is used in

production. The fact that the cost of a part used in production may be calculated based on a portion of Pratt's sales price is irrelevant. We see no inconsistency between CAS 410.30(a)(3) and the result that we reach here—treating the revenue share attributable to a particular part as a material cost.

14. The contracts provide, for example:

It is understood that each party is an independent contractor and that all persons engaged in work under this Agreement who are supplied by any party are the supplying party's employees and will in no sense be employees of the other party. The parties agree that no party will have the right to act as the agent or legal representative of the other, nor shall this Agreement establish or be deemed to constitute any partnership between the parties thereto. *United Techs.,* 01–2 BCA ¶ 31,592, at 16.

tures, but rather that: "the collaborations involve sharing of risks, costs and rewards of the commercial jet engine programs *in essentially the same way that joint venturers share risks and rewards.*" (Appellee's Br. at 22) (emphasis added). The Board agreed. Alternatively, Pratt argues that the arrangements should be treated as in substance "consignments," even though they did not qualify as legal consignments. Again the Board agreed, stating that the "collaboration parts are like consignment parts." *United Techs.*, 01–2 BCA ¶ 31,592, at 50.[15]

At first blush it might seem odd to argue that the traditional definitions of "cost" should be ignored in favor of an "economic substance" approach, but Pratt argues that because the term "cost" is not defined under CAS, the generally accepted accounting principles (GAAP) apply, and that GAAP requires a "substance over form" approach. Pratt's argument has a number of fatal defects.

■ *First*, GAAP applies only when CAS itself does not provide the answer. The FAR provides that "[t]he contractor's method of allocating indirect costs shall be in accordance with standards promulgated by the CAS Board, if applicable to the contract; *otherwise, the method shall be in accordance with generally accepted accounting principles which are consistently*

*applied.*" 48 C.F.R. § 31.203(d) (2001) (emphasis added); *see also* 48 C.F.R. § 31.201–2(a)(3) (2001) (stating that for determinations of allowability "[s]tandards promulgated by the CAS Board, if applicable [are to be applied]; otherwise, generally accepted accounting principles and practices appropriate to the particular circumstances"). Thus, GAAP is an accepted supplement to CAS, but only where CAS itself does not decide the issue. The supplementary nature of GAAP is also recognized in the literature:

> This hierarchy places the CAS Board's standards, rules and regulations first. If not in the CAS, the second point of the hierarchy is the cost principles of the FAR and agency FAR supplements. If nothing exists in the cost principles coverage, Generally Accepted Accounting Principles (GAAP) govern.

Lane K. Anderson, *Accounting for Government Contracts—Cost Accounting Standards* § 1.06 (2002); *see also* Margaret M. Worthington & Louis P. Goldsman, *Contracting with the Federal Government* 150 (4th ed. 1998) ("Considerable weight is generally given to GAAP when more definitive accounting treatment is not prescribed in the acquisition regulations, CAS, or the contract itself."). Here, as we have discussed, CAS does provide the answer when the terms "costs" and "material costs" are given their ordinary meaning.[16]

---

15. The Board's conclusion in this case, distinguishing a Fifth Circuit case, *Wesgo Div. of GTE Prod. Corp. v. Harrison (In re Sitkin Smelting Refining, Inc.)*, 648 F.2d 252 (5th Cir.1981), rested on the Board's erroneous factual premise that Pratt did not obtain title to the collaboration parts. *United Techs.*, 01–2 BCA ¶ 31,592, at 50. In *Wesgo*, the court distinguished between a sale and a bailment based, in part, on the passage of title. 648 F.2d at 254. Similarly, *Fowler v. Pennsylvania Tire Co.*, 326 F.2d 526 (5th Cir.1964), cited by Pratt on appeal as distinguishing between a sale and a consignment, is to no avail, in that the consignee in that case did not obtain title. *Id.* at 532. In short, the very

court of appeals consignment cases cited by the appellee and the Board appear to recognize that if title passes to the purported consignee, then a sale occurred.

16. Our decision in *Riverside*, 860 F.2d at 422, accepting the parties' agreement that GAAP was pertinent to the interpretation of the term "cost" in earlier procurement regulations is not to the contrary. Such a decision, merely accepting the parties' agreement, is not binding on later panels. *See Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to consti-

*Second,* contrary to Pratt's arguments that GAAP requires the use of substance over form, we are not persuaded that GAAP itself, as a general matter, requires the rejection of legal form in favor of "economic substance." [17] In support of its purported "substance over form" principle, appellee cites SAS No. 69 (Appellee's Br. at 15), though as the Board noted, this document is not itself part of the GAAP hierarchy, but rather is part of the generally accepted auditing standards (GAAS), *United Techs.,* 01–2 BCA ¶ 31,592, at 4. SAS No. 69 provides:

Generally accepted accounting principles recognize the importance of reporting transactions and events in accordance with their substance. The auditor should consider whether the substance of transactions or events differs materially from their form.

* * *

Because of developments such as new legislation or the evolution of a new type of business transaction, there sometimes are no established accounting principles for reporting a specific transaction or event. *In those instances, it might be possible to report the event or transaction on the basis of its substance by selecting an accounting principle that appears appropriate when applied in a*

*manner similar to the application of an established principle to an analogous transaction or event.*

SAS 69.09 (1992) (emphasis added). This equivocal statement that "it might be possible" is far from a mandate to disregard the form of a transaction for accounting purposes.

Appellee also relies on APB Statement No. 4 from the lower level GAAP hierarchy as "emphasiz[ing] the economic substance of events even though the legal form may differ." (Appellee's Br. at 15.) That statement provides in relevant part: "Substance Over Form. Although financial accounting is concerned with both the legal and economic effects of transactions and other events and many of its conventions are based on legal rules, the economic substance of transactions and other events *are usually emphasized* when the economic substance differs from the legal form." APB Statement No. 4 at ¶ 35 (italics in original, emphasis added). The statement that economic substance is "usually emphasized" fails to support Pratt's argument of its required application.

To bolster the weak arguments provided by the GAAP documentation, Pratt relies on its GAAP experts that testified before the Board, arguing that "[a]ll of the GAAP experts agreed that under GAAP, account-

---

tute precedents."); *Rhone–Poulenc Agro, S.A. v. DeKalb Genetics Corp.,* 284 F.3d 1323, 1334 (Fed.Cir.2002) (*en banc* order vacating panel decision) ("The en banc court has decided that, because ... the parties' not having contested the issue, [the prior case] is not binding authority.").

17. GAAP comprises a hierarchy of different sources. The Board described the GAAP hierarchy as follows:

Statement on Auditing Standards (SAS) No. 69, issued by the Auditing Standards Board of the American Institute of Certified Public Accountants (AICPA) in 1992, defines the most authoritative pronouncements (*i.e.,*

the top level) of the GAAP hierarchy as "Established Accounting Principles." These include Financial Accounting Standards Board (FASB) Statements and Interpretations, Accounting Principles Board (APB) Opinions, and AICPA Accounting Research Bulletins (tr. 2/144). At the lower level in the GAAP hierarchy is "Other Accounting Literature," which includes such things as FASB Statements of Financial Accounting Concepts, APB Statements, International Accounting Standards Committee Statements, accounting textbooks, etc. *United Techs.,* 01–2 BCA ¶ 31,592, at 3–4; *see also* Worthington & Goldsman, *supra,* at 149–50.

ing *must* follow the economic substance of the transaction." (Appellee's Br. at 29) (emphasis added). The cited testimony is in fact quite equivocal. Pratt's expert, Homgren, stated at the trial that: "I would say some arguments might be offered to recognize [a revenue share payment] as a cost—but in my opinion, it's preferable and more accurate to account for it as a reduction in revenue." (Tr. at 7–84.) Another Pratt expert, William Keevan, merely testified that the cost treatment of revenue shares was an "acceptable method." (Tr. at 9–124.)

Further undermining Pratt's claim that "substance over form" is a mandatory accounting principle is the fact that Pratt accounted for the revenue share payments for public financial reporting purposes as a cost from the inception of the collaboration agreements until July 2, 1996, after the present issue arose. The prior accounting practice was purportedly in accordance with GAAP, which provided the basis for Pratt's financial reporting. *See* Anderson, *supra,* § 1.01[2].

*Third,* and finally, even under Pratt's own view of GAAP, GAAP does not provide any meaningful guidance as to what constitutes the "substance" of a transaction or the circumstances under which "substance" treatment is appropriate. Even Pratt's GAAP experts were forced to speculate about a "spectrum of relationships" where "substance" treatment might be appropriate and to concede that there is "no easy [sic] to quantify metrics that can be applied in each case." (Tr. at 6–20); *see also* FASB Concepts Statement No. 2, Qualitative Characteristics of Accounting Information ("Substance over form is . . . a rather vague idea that defies precise definition."). The adoption of such a vague rule, which depends on experts' judgments as to the "substance" of a particular transaction, and the views of experts as to the appropriateness of using the "substance"

approach in any particular case, is inconsistent with the basic principles of government contracts accounting. The CAS rules "are designed to achieve *'uniformity and consistency'* in allocating costs to government contracts." *Boeing,* 298 F.3d at 1283 (emphasis added) (citing *Martin Marietta,* 13 F.3d at 1565). The first standard in CAS is entitled "Cost accounting standard—consistency in estimating, accumulating and reporting costs." CAS 401. This standard provides:

> *Consistency in the application of cost accounting practices is necessary to enhance the likelihood that comparable transactions are treated alike.* With respect to individual contracts, the consistent application of cost accounting practices will facilitate the preparation of reliable cost estimates used in pricing a proposal and their comparison with the costs of performance of the resulting contract. *Such comparisons provide one important basis for financial control over costs during contract performance and aid in establishing accountability for cost in the manner agreed to by both parties at the time of contracting.*

CAS 401–20 (emphases added). We have previously held that the question of allocation cannot depend on "amorphous inquir[ies]" such as Pratt proposes here. *Boeing,* 298 F.3d at 1284. Because the purported GAAP principle of substance over form provides no meaningful guidance, it does not permit consistent application, and cannot be used to define costs for purposes of CAS.

## IV.

In addition to its reliance on GAAP, Pratt also relies upon cases from the area of tax law in which the Supreme Court looked beyond the form of a transaction to its substance for tax purposes. These

cases provide no assistance to Pratt. They merely hold that, while the taxpayer is bound by the form of the transaction that it has selected, the taxpayer's use of a particular form will not prevent the government from looking to its substance. Pratt first cites for this proposition *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978), where the Supreme Court noted that "[i]n applying their doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." *Id.* at 573, 98 S.Ct. 1291. The Supreme Court looked to the substance of a transaction to determine if a sale-and-leaseback arrangement was a "simple sham" that did not merit treatment as such for tax purposes. *Id.* The Court found that the transaction was not a simple sham, and therefore, that the government could not disregard the form of the transaction for tax purposes. *Id.* at 580, 98 S.Ct. 1291. As the Court made clear, however, the doctrine applies "[i]n the field of taxation, [where] administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." *Id.* at 573, 98 S.Ct. 1291 (citations omitted); *see also United Parcel Serv. of Am., Inc. v. Comm'r of Internal Revenue*, 254 F.3d 1014 (11th Cir.2001).

There is a question as to what extent this doctrine should apply at all in the field of government contracts. But, even in the tax field, our attention has not been drawn to any cases holding that the doctrine permits the taxpayer, having selected the form of the transaction, to recharacterize the transaction according to its purported substance. Indeed, our sister circuits have held the opposite. *Rogers v. United*

*States*, 281 F.3d 1108, 1118 (10th Cir.2002); *Estate of Bean v. Comm'r of Internal Revenue*, 268 F.3d 553, 557 (8th Cir.2001). The Tenth Circuit noted that while "the Commissioner must have the ability to challenge the taxpayer's description of the relevant facts," the taxpayer has no such right. *Rogers*, 281 F.3d at 1118. There, the court refused to permit the taxpayer "to characterize a substantive transaction as one thing rather than another and force the Commissioner—and this court—to accept the automatic consequences of the characterization." *Id.* In short, it was "*not up to the taxpayers to have the final say on how [a transaction] is characterized.*" *Id.* (emphasis added). So too the Eighth Circuit has rejected a taxpayer's efforts to recharacterize a transaction based on its substance, holding that "[o]nce chosen, *the taxpayers are bound by the consequences of the transaction as structured*, even if hindsight reveals a more favorable tax treatment." *Bean*, 268 F.3d at 557 (emphasis added) (citing *Grojean v. Comm'r of Internal Revenue*, 248 F.3d 572, 576 (7th Cir.2001)).

Thus, even if the "substance over form" doctrine from the tax field were applied in the field of government contracts to recharacterize a contractor's commercial arrangements, Pratt would be bound by the consequences of the commercial transaction as it chose to structure it, *i.e.*, as the purchase of parts from the foreign parts suppliers. It would not be permitted to recharacterize the commercial transaction as a joint venture or consignment. If at all, it is the government that could rely on the substance over form doctrine to challenge "sham" transactions in a contractor's commercial operations.[18]

---

18. *See Defense Contract Audit Agency Contract Audit Manual* 7–1801,1807 (instructing government contracts auditors to "[d]etermine

not only the form of the business organization but the actual relationship (substance) between the venturing contractors").

## V

■ Pratt argues that including the price paid for collaboration parts for the calculation of bases for overhead allocation is inequitable. Pratt first argues that it is inequitable to require Pratt to account for its collaboration parts when one of its competitors was given different treatment. That a defense contracting official may have reached a contrary result based on similar facts does not bind the government or this court.

Pratt also argues that CAS does not include Government Furnished Material (GFM) or Government Furnished Equipment (GFE) as a cost and that it is inequitable to include a "cost" for collaboration parts for overhead allocation while excluding the value of GFM and GFE. Our task, however, is to interpret CAS, not to rewrite it to provide an equitable result.

## VI

■ A final argument raised by Pratt before the Board was that the government is estopped from contesting Pratt's determination that the revenue payments for parts acquired under the collaboration requirements did not constitute costs. This is said to be so because of the government's prior acceptance of Pratt's treatment of those items. *United Techs.*, 01–2 BCA ¶ 31,592, at 53. Based on its interpretation of "cost," the Board did not reach this issue. *Id.* This question, therefore, remains open on remand. Adjudication of the estoppel issue must proceed under the "well settled [rule] that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Cmty. Health Servs. of Crawford County,*

*Inc.* 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Beyond a mere showing of acts giving rise to an estoppel, Pratt must show "*affirmative misconduct* [as] a prerequisite for invoking equitable estoppel against the government." *Zacharin v. United States,* 213 F.3d 1366, 1371, 55 USPQ2d 1047, 1051 (Fed.Cir.2000) (emphasis added).

## VII

In summary, we hold that the CAS regulations define material costs in terms of items purchased for a price, and that the collaboration parts satisfy this definition. It is irrelevant that GAAP may allow Pratt to look to the supposed "substance" of the transactions and to treat the purchase arrangements as joint ventures or consignments. GAAP cannot trump CAS, and allowing a contractor to recharacterize transactions based on a "substance over form" approach is fundamentally inconsistent with CAS, which requires consistency and uniformity of approach. Thus, under CAS 410, 418 and 420, in allocating G & A, B & P, and IR & D, Pratt was required to include a cost for collaboration parts in its allocation bases.

## CONCLUSION

For these reasons we hold that Pratt purchased the parts from its foreign parts suppliers, and that the revenue share payments comprise costs for those parts. Accordingly, this case is vacated and remanded for further proceedings consistent with this opinion.[19]

---

**19.** To the extent that Pratt may argue that some portion of the revenue shares represented payments for items other than parts, Pratt may provide that evidence on remand. The burden is upon Pratt, however, to show that the revenue share payments included payments beyond that for the collaboration parts. The question of the propriety of removing Drag from the indirect cost pool is also not before us on appeal, and remains open on remand.

COSTS

No costs.

*VACATED AND REMANDED.*