# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| A-T Solutions, Inc. | )　　ASBCA No. 59338 |
| | ) |
| Under Contract No. W91CRB-09-C-0043 | ) |

APPEARANCES FOR THE APPELLANT:　　Terry L. Albertson, Esq.
　　　　　　　　　　　　　　　　　　　Robert J. Sneckenberg, Esq.
　　　　　　　　　　　　　　　　　　　Crowell & Moring LLP
　　　　　　　　　　　　　　　　　　　Washington, DC

APPEARANCES FOR THE GOVERNMENT:　　Raymond M. Saunders, Esq.
　　　　　　　　　　　　　　　　　　　Army Chief Trial Attorney
　　　　　　　　　　　　　　　　　　　MAJ Elinor J. Kim, JA
　　　　　　　　　　　　　　　　　　　Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE O'SULLIVAN

Appellant A-T Solutions, Inc. (ATS) appeals a contracting officer's final decision denying its claim to recover commercial catalog prices for training equipment used in connection with improvised explosive device (IED) training provided under an Army contract. Only entitlement is at issue. We have jurisdiction under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109. We sustain the appeal.

## FINDINGS OF FACT

### Solicitation and Award

1. In December 2008, the U.S. Army Research, Development and Engineering Command (RDECOM) solicited proposals for a contract to provide training for armed forces to proactively defeat the IED threat. The solicitation was issued on behalf of the Department of Defense Joint IED Defeat Organization (JIEDDO), Joint Center of Excellence (JCOE), Joint Asymmetric Threat Awareness and Counter (JATAC) training program. It contemplated a single award of a cost-plus-fixed-fee (CPFF) contract. (R4, tab 1 at 15, tab 3 at 1, 5, 15) The awardee was to provide professional training services and training materials and equipment, both inside the Continental U.S. (CONUS) and outside the Continental U.S. (OCONUS), for a base year and up to four option years (R4, tab 3 at 23).

2. Previously, in 2007, the Army awarded the first JATAC training contract to ATS on a firm-fixed-price, sole source, "gap-filler" basis to meet urgent training needs

(tr. 29-30; R4, tab 1 at 16). This first contract was followed by a competitive contract award to ATS pursuant to the GSA Schedule in 2008 (tr. 30). Under both the first and second contract, ATS provided its training materials and equipment as commercial items and was paid for them at its catalog prices (*id.*). These items included various different types of IEDs, training kits, and IED defeat tools (R4, tab 10). The Army decided to use a CPFF contract for the third procurement, which was competitive, with four offerors submitting proposals (app. supp. R4, tab 12 at 16).

3. ATS submitted its proposal on 30 January 2009 (R4, tabs 4-11). It proposed a total estimated cost across five years of $198,920,794, which included a fixed fee of $10,391,146 (R4, tab 4 at 5). In the narrative portion of its cost/price proposal, it spelled out the assumptions on which its proposal was based. Among them were the following:

> **Fixed Fee** – ATS proposes a fixed fee of 9% on all direct labor, consultants and subcontractors. ATS proposes a fixed fee of 0% on all other cost elements.
>
> ....
>
> **Travel** – All travel will be conducted IAW Joint Travel Regulations (JTR). Travel will be billed at actual incurred cost, with no additional fee or burdens applied....
>
> ....
>
> **Training Materials and Equipment** – ATS is a manufacturer, distributor and supplier of training products to a wide variety of customers. Training Materials and Equipment listed in this proposal include IED products, IED training devices, training kits, training manuals and commercial software products. These items are priced at the ATS commercial catalog price, per FAR 52.215-21(a)(ii)(2)(B) and FAR 31.205-26. Quantity discounts have been applied where appropriate based on the total quantity of each item required by the SOW. Any purchase of quantities less than indicated in the SOW may result in a higher unit price charged to the Government. A complete set of ATS product catalogs, including photos and descriptions, is included with this proposal.
>
> ....

2

> **Consumable Items** – In order to support a dynamic and
> relevant training program, each training program requires
> local procurement of consumable items. These items
> cannot be specifically identified or priced in advance. ATS
> will procure these items locally at the training location, to
> save shipping and handling costs. The total cost of
> consumable items is a relatively small component of the
> training program. In this proposal, we have identified a
> "budget" for locally procured consumable items for each
> training program. When directed by the Government, ATS
> will locally procure appropriate items and invoice them at
> actual incurred cost (no fee).

(R4, tab 7 at 3-5) Examples given of consumable items included emerging threat IED components, electronics, and booby trap materials, repair parts, stage props to simulate field IED fabrication cells, and items used to conceal IEDs (*id.* at 5-6).

4. In summary, ATS proposed to bill direct labor, consultants, and subcontractors at cost plus a fixed fee calculated at 9% of estimated cost. ATS proposed to bill travel at cost (no fee). ATS proposed to charge for its commercial item training materials and equipment at the catalog prices attached to the proposal (R4, tabs 10-11). Finally, consumable items bought locally would be billed at incurred cost (no fee).

5. The government's Pre-Negotiation Objective Memorandum (POM) noted that ATS's proposal was "indicative of a superior understanding of the requirements," demonstrated "unique expertise required to execute JATAC requirements" and "superior vision," and offered lower hourly rates than the other offerors (app. supp. R4, tab 12 at 26). With respect to ATS's proposed training material and equipment costs, proposed as part of Other Direct Costs (ODCs), the government's evaluation stated:

> **ODCs** – Proposed a total ODC amount of $73,072,471.00.
> The amount includes CONUS and OCONUS travel,
> equipment, weapons, weapon supplies, clothing, training,
> subcontractor non-labor costs. ATS' ODC amount is the
> third highest among offerors. However, ATS provided
> detailed back up documentation to show their calculations
> at arriving at their ODCs total and it appears they fully
> understand the requirements of the SOW so the costs are
> considered realistic.

(*Id.* at 37) The government further determined as follows:

3

8. The price proposal from ATS is determined to be realistic, fair and reasonable based on the cost realism/price analysis performed, their technical proposal is rated Excellent, and they received a very low performance risk rating; therefore, no further negotiations are necessary by the Government. Since two of the four proposals submitted are competitive and considered fair and reasonable, it is recommended the Price-Negotiation Memorandum be waived.

9. The total contract price [proposed by ATS] of $198,920,794.00 should be accepted by the Government without further negotiations for the services requirement under this CPFF contract.

(*Id.* at 46) Based on the foregoing, the POM concluded that award should be made to ATS without further negotiation (*id.* at 29-30).

6. Contract No. W91CRB-09-C-0043 (the contract) was awarded to ATS on 19 May 2009, with an effective date of 1 May 2009 (R4, tab 1). The award stated that ATS's January 2009 proposal was accepted and that the contract consisted of "the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary." (*Id.* at 1)

Contract Clauses

7. The contract contains the following clauses incorporated by reference: FAR 52.215-2, AUDIT AND RECORDS—NEGOTIATION (JUN 1999); FAR 52.215-8, ORDER OF PRECEDENCE—UNIFORM CONTRACT FORMAT (OCT 1997); and FAR 52.244-6, SUBCONTRACTS FOR COMMERCIAL ITEMS (MAR 2007). The contract also incorporates, in full text, FAR 52.216-7, ALLOWABLE COST AND PAYMENT (DEC 2002). (R4, tab 1 at 59-60, 62-65)

8. FAR 52.215-2 provides, in relevant part:

(b) Examination of Costs. If this is a cost-reimbursement, incentive, time-and-materials, labor-hour, or price redeterminable contract, or any combination of these, the Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all records and other evidence sufficient to reflect

4

properly all costs claimed to have been incurred directly or indirectly in performance of this contract.

FAR 52.244-6 provides, in relevant part:

> (a) Definitions. As used in this clause—
>
> "Commercial item" has the meaning contained in Federal Acquisition Regulation 2.101, Definitions.
>
> "Subcontract" includes a transfer of commercial items between divisions, subsidiaries, or affiliates of the Contractor or subcontractor at any tier.
>
> (b) To the maximum extent practicable, the Contractor shall incorporate, and require its subcontractors at all tiers to incorporate, commercial items or nondevelopmental items as components of items to be supplied under this contract.

FAR 52.216-7 provides, in relevant part:

> (a) *Invoicing.* (1) The Government will make payments to the Contractor when requested as work progresses, but (except for small business concerns) not more often than once every 2 weeks, in amounts determined to be allowable by the Contracting Officer in accordance with Federal Acquisition Regulation (FAR) subpart 31.2 in effect on the date of this contract and the terms of this contract....
>
> ....
>
> (b) *Reimbursing costs.* (1) For the purpose of reimbursing allowable costs..., the term "costs" includes only—
>
> (i) Those recorded costs that, at the time of the request for reimbursement, the Contractor has paid by cash, check, or other form of actual payment for items or services purchased directly for the contract;

(ii) When the Contractor is not delinquent in paying costs of contract performance in the ordinary course of business, costs incurred, but not necessarily paid, for—

(A) Supplies and services purchased directly for the contract and associated financing payments to subcontractors, provided payments determined due will be made—

(1) In accordance with the terms and conditions of a subcontract or invoice; and

(2) Ordinarily within 30 days of the submission of the Contractor's payment request to the Government;

(B) Materials issued from the Contractor's inventory and placed in the production process for use on the contract;

(C) Direct labor;

(D) Direct travel;

(E) Other direct in-house costs; and

(F) Properly allocable and allowable indirect costs, as shown in the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts; and

(iii) The amount of financing payments that have been paid by cash, check, or other forms of payment to subcontractors.

Contract Performance, Invoicing, and Audit

9. At a kick-off meeting following award of the contract, ATS sought and received government approval to invoice for the training materials and equipment separately from the training services. Starting in October 2009, ATS began invoicing for the training materials and equipment at catalog prices, and the government paid the invoices promptly and in full. (Tr. 48-50)

10. In February 2010, ATS received notice that the Defense Contract Audit Agency (DCAA) would be conducting an audit of contract cost. DCAA requested to

review ATS's material costs after it had reviewed, and approved, ATS's labor costs. (Tr. 46-48) Because DCAA did not accept ATS's position that it need not provide cost information for items that had been proposed and accepted at price, and the Army deferred to DCAA, ATS suspended its billing for the training materials and equipment in February of 2010 (tr. 47, 67). ATS continued to provide all services and equipment required under the contract. It resumed billing, but only provisionally, at direct material cost for the training aids and devices in September of 2010. (Tr. 67) Thereafter, in mid-2013, ATS began billing for delivered training materials at fully burdened cost (tr. 86).

11. DCAA finalized and issued its audit report on 7 July 2011 (R4, tab 17). The subject of the audit, as described by DCAA, was as follows:

> As part of our comprehensive audit of A-T Solutions, Inc. (ATS), we examined the contractor's accounting system as of March 10, 2011, to determine whether it is adequate for accumulating costs under Government contracts and whether the billing procedures are adequate for the preparation of cost reimbursement claims, i.e., interim public vouchers and progress payments.
>
> ATS is responsible for establishing and maintaining an adequate accounting system for accumulating and billing costs under Government contracts. Our responsibility is to express an opinion on the adequacy of the accounting system based on our examination.

Based on its examination, DCAA concluded that:

> In our opinion, ATS' accounting system is inadequate for accumulating and billing costs under Government contracts. Our examination disclosed a significant deficiency that is considered to be a material weakness in the design or operation of the accounting system. We determined the contractor is not currently billing material at cost as required under a cost reimbursable contract. In our judgment, this deficiency could adversely affect the organization's ability to initiate, authorize, record, process, and/or report costs in a manner that is consistent with applicable Government contract laws and regulations. As a result, we recommend you

7

pursue suspension of a percentage of reimbursement of costs in accordance with DFARS 242.7502.

(R4, tab 17 at 4-6)

12. DCAA explained the basis for its determination as follows:

> We determined...the contractor is billing costs associated with its training aids at catalog price rather than at actual unit cost. During discussions with Ms. Debbie Ricci, chief financial officer, [1] we determined the contractor is continuing a practice started under the original firm-fixed-price contract. However, the contractor's current contract, which began in late 2009, is cost-plus-fixed-fee. Cost reimbursable type contracts require materials to be tracked and billed at the base cost level, unless otherwise stated in the subject contract. ATS asserts its material billings are in accordance with FAR 31.205-26(e), which allows for material costs to be billed at price when costs are transferred and recorded between company segments at price. We reviewed the contractor's submissions provided in support of its assertion and performed an additional field visit on March 10, 2011. Based on the information provided, we do not believe ATS meets all the requirements of FAR 31.205-26(e). Although, the contractor has established the commerciality of its products and has adequately demonstrated a physical transfer of material goods between Mission Support and Training (Warfighter), its accounting system documentation does not show a transfer of material at price between divisions as specifically required by FAR 31.205-26(e)(1)(2), which states:

> > *However, allowance may be at price when—*
> > *(1) It is the established practice of the transferring organization to price <u>interorganizational</u> (underlined for emphasis) transfers at other than cost for commercial work of the contractor or any division, subsidiary or affiliate of the contractor under a common control; and*
> > *(2) The item being transferred qualifies for an exception under [FAR] 15.403-1(b) and the*

---

[1] Ms. Ricci succeeded Mr. Wise as CFO of ATS in June of 2010 (tr. 60).

> *contracting officer has not determined the price to
> be unreasonable.*

> The transfer occurs at cost between the ATS Mission
> Support and ATS Training Divisions. ATS' proposed
> practice of billing material costs based on a commercial
> price, if permitted, would result in significant overbillings
> to the Government in excess of the contractor's cost for the
> material.

(R4, tab 17 at 7)

13. ATS disagreed that its accounting records showed a transfer at cost rather than price and that its accounting system was therefore inadequate. In its rebuttal provided to DCAA prior to issuance of the final audit report, ATS stated:

> The Company disagrees with DCAA's comment that the
> accounting records do not reflect the transfer of commercial
> products from Mission Support Solutions to Warfighter
> Solutions at price. DCAA's comment is based on the fact
> that Warfighter Solutions' Project Summary Report ("PSR")
> for this contract, a Deltek CostPoint management report,
> does not reflect Mission Support Solutions' price as the cost
> to the project and Warfighter Solutions. This reporting
> practice was a result of an intentional setup selection in the
> initial implementation of Deltek Costpoint. *In response to
> the audit comment by DCAA, the Company has modified
> the capture of price related to intercompany* [sic] *transfers
> on the PSR report and has fixed the exception noted by
> DCAA. The Company does not believe this reporting
> exception invalidates the Company's interorganizational
> transfers pursuant to FAR 31-205-26(e).*

> The Company is confident that (1) the transfers were
> properly recorded by the Mission Support business unit at
> price in accordance with FAR 31-205-26(e), and (2) the
> financial results of Mission Support Solutions and
> Warfighter Solutions reflect the economics of this
> transfer at price. *Based on these facts, the Company
> believes all requirements of FAR 31.205-26(e) have
> been met.* In analyzing FAR 31.205-26(e), the FAR
> states that the established practice relative to
> interorganizational transfers must be that the *transferring*

9

> *organization have an established practice to price these transfers at other than cost.* Based on the FAR definition the Company met this requirement. The Company was able to document that since 2007, the Mission Support Solutions business unit has consistently done just that – price all transfers at catalog price.

(R4, tab 17 at 15) ATS further noted DCAA's agreement that the products sold by Mission Support were commercial products (*id.* at 14).

14. DCAA responded to ATS's rebuttal:

> Based on the documentation reviewed during our field visits, we determined the intercompany [sic] transfers were being recorded at cost rather than price. We contend that the Project Summary Reports are an integral part of ATS' ability to demonstrate its material transfer practices as they reflect recorded job costs. Therefore, ATS' inability to show material transfers at price does not support its assertion of an established practice. Moreover accounting system modifications made in response and subsequent to DCAA's findings does [sic] not constitute a historically established practice as defined by FAR.

(R4, tab 17 at 8)

15. Following issuance of the audit report, ATS continued performing the contract and seeking resolution of the issue with the government. Discussions took place throughout 2010 and 2011 that included the possibility of modifying the contract to add a firm-fixed-price contract line item number (CLIN) to facilitate ATS's billing the commercial training materials at price. Ultimately, the Army decided not to modify the contract. (Tr. 64; R4, tab 15 at 1, 10-11, tab 20 at 5 n.1)

16. In December of 2012, ATS representatives met with the Defense Contract Management Agency (DCMA) administrative contracting officer (ACO) for the JATAC contract and other DCMA personnel to follow up on the status of ATS's accounting system in the wake of DCAA's recommendation that ATS's accounting system be found inadequate. ATS representatives at this meeting included its President, Dennis Kelly, and its CFO, Deborah Ricci. DCMA informed ATS at the meeting that it would have to prove it was capable of accumulating costs on the JATAC contract to prevent its accounting system from being found inadequate. (Tr. 73-74) ATS thereafter, in order to avoid an adverse determination of inadequacy, submitted a "Corrective Action Plan" to provisionally bill its products at fully burdened cost until

10

the dispute could be resolved (tr. 74-76; R4, tab 24). On 10 May 2013, DCAA issued an audit report concluding that ATS had effectively implemented corrective actions to address the deficiency noted in its earlier audit report (R4, tab 25). DCMA thereafter sent ATS a formal determination that its accounting system was adequate for accumulating and billing costs under government contracts (R4, tab 26).

ATS Business Units and Accounting Practices

17. At all times relevant hereto, ATS was a small business that provided counter-terrorism training services and solutions, including training related to how to identify, defuse, and evaluate IEDs. In providing the training, ATS relied on the experience and expertise of its personnel and on training materials and equipment, primarily IED replicas, manufactured by ATS. (Tr. 21-22) At the time of contract award, ATS had two business units involved in delivering IED training. Its Training Solutions business unit (later renamed Warfighter Solutions) contracted for and provided the training, while the Logistics and Production unit (later renamed Mission Support), under its Technical Solutions business unit, manufactured the training aids and devices used to provide the training. (Tr. 22-23; app. supp. R4, tab 11)

18. Training materials and equipment produced by ATS's Mission Support unit were sold commercially for several years prior to award of the contract. Customers included state and local law enforcement agencies and private companies. ATS sold its products on the GSA Schedule and developed its first commercial catalog in the 2005/2006 timeframe. The products were sold either with or independently of the training services offered by ATS. (Tr. 24-25; R4, tabs 10-11)

19. Prior to 2009, ATS employed accounting software known as Peachtree. In January 2009, it switched over to more sophisticated cost accounting software developed specifically for companies doing business with the federal government, Deltek CostPoint. Peachtree was characterized by ATS's former chief financial officer, Michael Wise, as "kind of a low-end software for small businesses," similar to QuickBooks in that it "basically gives you a nice profit and loss statement and keeps track of your balance sheet. But it doesn't really go into a lot of details on how every transaction that happens within the company occurs." (Tr. 50-51) Successor ATS CFO Deborah Ricci agreed that Peachtree "has a balance sheet, income statement, and ... transactions and journal entries. When you get to Costpoint, Costpoint is just much more dimensional." In particular, Costpoint "operates on different levels called organizations.... [Y]ou can establish the Training Division versus Mission Support Division. Each one of these groups has what's called an organization within [Cost]point. And you can generate any type of details you need at that level." (Tr. 62)

20. ATS witnesses testified that DCAA's conclusion that the transfer of training materials between divisions occurred at cost was erroneous and contradicted by the

11

documentary evidence of record. Both before and after the transition to Costpoint, Mr. Wise testified that ATS's business practice was for its Training Solutions unit to determine which and how many training aids and devices would be needed to deliver training required by a contract, and then place an order for the material and equipment with the Mission Support unit. The material and equipment would then be transferred from the Mission Support unit to the Training Solutions unit and shipped to the training site. The cost to the Training Unit was at catalog price:

> Q And what value would the products be signed over to the Training Division?

> A Effectively bill price, the catalogue price. Now within Logistics and Production we kept track of both—you know, how much it cost us to build it and how much we were selling it for. Because we needed to know how we were doing. Are we doing this right? Are we losing money or are we making money?

> So we kept track of both within Logistics and Production. But from the training perspective, all they saw was the price, whatever it cost them to deliver that training.

> Q And did that transfer or assigned payment to divisions price, was that, did that accounting practice change whatsoever between the Peachtree and the Deltek systems?

> A It got more sophisticated. It didn't change. I mean, the intent, the process, didn't change. We just had better tools, better documents, better controls over the process, but it was still the same process.

> Q And that process was that price?

> A That price, yes. Keep in mind, you know, we were—in our industry the leaders of our divisions are all generally Type A personalities. And I've got the best division, I'm going to be this—so there was a little bit of competition there, you know.

> Logistics and Production, they wanted to be the most successful. Training, they wanted to be the most successful. And so, you know, when we sold a device we

wanted Logistics and Production to have the credit for that sale at the catalogue price.

(Tr. 54-56)

21. Ms. Ricci testified that DCAA's conclusion that the transfers occurred at cost was incorrect:

> A That's not correct. The transfer's at price. Everything [that] Mission Support transfers is at price. Nothing leaves Mission Support at anything other than price.
>
> Q And how did—do you know how DCAA got the idea that the transfer was at cost?
>
> A Yes, the one report they had asked for was called the project summary report. And we had provided it at the highest level. So they integrated...at our A-T Solutions, Inc. level and all the costs, both sides of everything, were just loaded into this same report.
>
> ....
>
> Q Were there subsidiary records in the Deltek accounting system that showed where the revenue for the products at issue were recorded?
>
> A Absolutely. As I explained, Costpoint has different organizations. So we had separate organizations for training versus a separate organization for Mission Support. Both of those organizations have their own P&Ls and basically you can just run at that level.
>
> Or revenue summaries, you can run revenue details by each organization. And within those revenue summaries you can see that...Mission Support transferred those products at price.

(Tr. 70-71) Ms. Ricci explained that there were business reasons to record revenues by division, including determining whether goals had been met for purposes of management compensation (tr. 72).

13

22. Fiscal year 2009 revenue summaries by division are included in a package of information Ms. Ricci prepared and delivered to DCAA in February of 2011 to document how the revenues from interdivisional transfers were recorded in ATS's accounting system (tr. 88; supp. R4, tab 34). These summaries show revenue for both the Training Solutions division (CIED, organization 1.1.01.0.5.20.0), and the Logistics and Production division (later renamed Mission Support, organization 1.1.01.0.5.60.0) (tr. 89-92; supp. R4, tab 34, exs. 3-4). The summaries show that revenues from both JATAC II (predecessor contract) and JATAC III (the contract involved in this appeal) sales are recorded for the Mission Support division of ATS at catalog price (tr. 91-93; R4, tab 34, ex. 4 at 2). Attached to the revenue summary for the Mission Support division are over twenty pages of detail listing the equipment sold by invoice at catalog price (R4, tab 34, ex. 4 at 4-27). However, ATS was unable to convince DCAA to examine these subsidiary records (tr. 70-71, 92).

23. ATS's expert witness, Mr. James Thomas,[2] testified and provided an expert report concerning ATS's books and records for 12 transactions that took place in 2007-2008 when ATS was still using Peachtree accounting software (tr. 96-99; app. supp. R4, tab 18). Mr. Thomas characterized Peachtree as a small business software application based on a single organizational structure with a one dimensional chart of accounts, and stated that ATS used separate accounts within Peachtree to record sales related to the Training division (40xxx series) and the Logistics and Production division (41xxx series) (app. supp. R4, tab 18 at 4-5). In particular, Mr. Thomas examined ATS's accounting records relating to training services provided to the Pennsylvania State Police under invoice No. 523 dated 19 September 2008 (id. at 4).

24. Mr. Thomas's report summarizes his examination and conclusions:

> The ATS accounting records for the PA State Police for invoice number 523 show the following:
>
> 1. The PA State Police agreed to a fixed price of $49,912 for training services to be provided by ATS. The fixed price of $49,912 included $7,800 of training equipment at ATS' commercial prices.

---

[2] Mr. Thomas is a certified public accountant and a partner in the firm of PricewaterhouseCoopers LLP. He has over 30 years of experience advising companies in government contract pricing, costing, and accounting, and provides expert accounting services in government contract disputes. (App. supp. R4, tab 18, ex. A)

14

2. The Training division of ATS had responsibility for providing the training for the PA State Police and, as part of the training, furnishing training equipment such as student guides, training kits and electronic supplement kits supplied by the Logistics & Production division of ATS.

3. ATS issued invoice number 523 to the PA State Police dated 19 September 2008 for $49,912. The invoiced amount included training services totaling $42,112 and training equipment at commercial prices totaling $7,800.

4. The training equipment was shipped by the Logistics & Production division to the PA State Police facility for use by the Training division in conducting the training on 22-26 September 2008.

5. ATS recorded the invoice and sale of $49,912 on 19 September 2008. The $7,800 consisted of three training equipment items valued at commercial prices – 16 Electronics Training Kits ($4,800), 16 Electronics Student Guides ($2,000) and an Electronics Class Supplement Kit ($1,000). The $7,800 of training equipment was recorded as a Logistics & Production division sale in general ledger account 41000 – ATS Product Sales [–] to account for the physical transfer of training equipment to the Training division. The remaining $42,112 for training services was recorded as a Training division sale in general ledger account 40500 – State/Local Sales....

Based on the accounting records for invoice number 523, it is my opinion that the transfer of training equipment from the Logistics & Production division to the Training division was recorded as a sale by the Logistics & Production division at commercial prices. If the transfer had been recorded at cost rather than price, the Logistics & Production division would have received a sales credit in account 41000 for a total of $3,868.64, which is the cost of

15

goods sold for the equipment [as shown by ATS's accounting records].

(App. supp. R4, tab 18 at 6-7) Mr. Thomas evaluated 11 other transactions in the 2007-2008 time frame and found the accounting for those transactions to be consistent with that for the PA State Police sale. He also looked at later ATS accounting records generated by the Deltek Costpoint software and found no indication that training equipment transferred between the two ATS divisions was ever recorded by the transferring division (Logistics and Production) at anything other than price. (*Id.* at 7-8; tr. 99)

25. The ATS Peachtree accounting records that Mr. Thomas reviewed are listed in exhibit B to his expert report:

Tab 1—ATS invoices pertaining to 12 sales to commercial customers in 2007-2008 (including invoice number 523 for $49,912 to the PA State Police);

Tab 2—2007 ATS general ledger trial balance;

Tab 3—2008 ATS general ledger trial balance;

Tab 4—2007 general ledger detail for Account 41000, ATS Product Sales;

Tab 5—2008 general ledger detail for Account 11000, Accounts Receivable (showing $49,912 as both a debit to invoice 58031287 and a credit to invoice 523, both associated with the PA State Police sale at 21);

Tab 6—2008 general ledger detail for Account 14000, Inventory-Logistics (showing $1,094.40 as the cost of goods sold for the student guides sold on invoice 523 at 253);

Tab 7—2008 general ledger detail for Account 14200, Inventory-Production Finished Goods (showing $2359.52 and $414.72, respectively, as the cost of goods sold for the Electronics Training Kits and the Electronics Class Supplement Kit at 55);

Tab 8—2008 general ledger detail for Account 40500, Training division sales (showing a sale of $42,112 for training services on invoice 523);

16

Tab 9—2008 general ledger detail for Account 41000, ATS Product Sales (showing a total sale of $7,800 on invoice 523 to the credit of ATS's Logistics and Production division at 60);

Tab 10—2008 general ledger detail for Account 56200, Cost of Goods Sold (showing the total cost of goods sold for the three items sold under invoice 523 to be $3,868.64 at 68).

26. In summary, under the Peachtree accounting system employed by ATS in 2007-2008, a sale of training services by the Training division that incorporated training materials produced by the Logistics and Production division was accounted for as follows: when the sale was made, ATS issued an invoice to the customer for both the training services and the training materials, the latter at catalog price. The amount representing training materials at catalog price was recorded as a credit to Product Sales in the Logistics and Production general ledger account 41000. The amount representing the training services was recorded separately as a credit to the Training division (in the case of the PA State Police sale, account 40500, state/local sales). At the same time, ATS would record a debit to accounts receivable in the full amount of the sale, and a credit to Logistics and Production inventory accounts for cost of goods sold. (Findings 23-25; tr. 83)

27. Under the Costpoint accounting system employed by ATS starting on 1 January 2009, a sale of training services by the Training division that incorporated training materials produced by the Logistics and Production division was accounted for as follows: when the sale was made, the Training unit would issue an invoice to the customer for both the training services and the training materials, the latter at catalog price. The sale amount representing training materials at catalog price was recorded as Logistics and Production division (organization 1.1.01.0.5.60.0) revenue, but posted to accounts receivable for the Training division (organization 1.1.01.0.5.20.0), which "owned" the contract and had the responsibility for collecting revenue from the sale. (Supp. R4, tab 34 at 1-2, exs. 1, 4) The revenue summary for the Training division would be credited with the sale price for the training services (*id.*, ex. 1 at 4-5), but its profit and loss statement for the period would not contain either revenue or cost related to the training materials since the materials were passed through to the end customer at the same catalog price credited as revenue to the Logistics and Production division and the net impact to the training organization was zero (*id.* at 2, ex. 3).

28. ATS witnesses testified, and the government does not contest, that ATS accounted for both external sales and internal transfers by the Logistics and Production division the same way, both before and after ATS adopted the Costpoint accounting system (findings 20-22; gov't br., proposed findings of fact (PFF) ¶ 13).

17

The predecessor Peachtree system, however, did not allow for the degree of visibility into transactions at the interdivisional level that Costpoint made possible (finding 19).

Contracting Officer's Final Decision and this Appeal

29. On 26 March 2014 ATS submitted a certified claim to contracting officer (CO) Ofelia Rivera asserting entitlement to payment of catalog prices for ATS's commercial item training materials and equipment (R4, tab 30 (ltr. dtd. 2013 in error)). ATS stated in its claim that the difference between the amount billed and paid by the government and the prices to which it was entitled was $8,717,958 as of 31 January 2014, and likely to grow to an estimated $9,832,565 by the end of the contract term (*id.* at 1).

30. CO Rivera issued a final decision (COFD) denying ATS's certified claim on 22 May 2014 (R4, tab 31). In her decision, she acknowledged that ATS proposed to provide its commercial training materials at catalog price (*id.* at 2-3). However, she found this fact insufficient to overcome the terms of the solicitation and resulting CPFF contract, in particular the Allowable Cost and Payment clause, FAR 52.216-7 (*see* finding 8), which sets forth the terms under which payments will be made to the contractor (*id.*). She observed that using catalog pricing "to support a proposed estimated cost in a competitive acquisition" was "appropriate" but would not influence "how payments are actually disbursed on a CPFF contract." (R4, tab 31 at 3) She also found the commerciality of the materials not relevant, since the government's requirement "as a whole" was non-commercial. While commercial materials could be provided under the contract, she stated, ATS's accounting for the cost of materials must conform to the cost principles and procedures of FAR Part 31 and the terms of the cost-type contract. (*Id.*)

31. CO Rivera also found that ATS's training materials did not come within the FAR 31.205-26(e) exception allowing materials transferred between divisions of a company to be billed at price if it is the established practice of the transferring division to price such transfers at other than cost. Her finding in this regard was based on DCAA's conclusion that ATS's inter-organizational transfers were recorded at cost, not price, and on the misimpression that DCAA had "determined ATS's accounting system [to be] inadequate" to meet the FAR requirement for billing at price. (*Id.* at 3)[3]

32. Finally, CO Rivera rejected the possibility of modifying the contract to add a firm-fixed-price CLIN to allow ATS to bill, and the government to pay, for the training materials at catalog price. In her opinion, such a modification would not be in the best

---

[3] Ms. Ricci testified that this finding was erroneous since the Defense Contract Management Agency (DCMA), not DCAA, has the authority to determine whether a contractor's accounting system is inadequate, and DCMA made no such determination with respect to ATS's accounting system (tr. 79).

interest of the government, as it would "circumvent" FAR 52.216-7, "nullifying a contracting officer's ability to control costs." (R4, tab 31 at 4)

33. ATS timely appealed the COFD to the Board on 27 May 2014, and its appeal was docketed on 28 May 2014. A hearing was scheduled for 3-5 February, 2015. On 4 November 2014, the government filed a motion for partial summary judgment on Count 1 of ATS's complaint. Because less than three months remained until the hearing, the Board deferred ruling on the government's motion.

## DISCUSSION

### Contentions of the Parties

ATS contends that the government agreed to pay commercial item catalog prices for its training materials by accepting its offer to provide those items at its catalog prices and incorporating its proposal into the contract. ATS points out that, consistent with such an agreement, the government accepted and paid ATS's invoices for the materials at catalog price until February of 2010 when DCAA questioned the allowability of ATS's billings under the contract. Alternatively, ATS asserts that its interdivisional transfers of the training materials were at price, thus entitling it to bill the government for those materials at price pursuant to the cost principle at FAR 31.205-26(e).

The government presented no testimony or other evidence regarding whether the government agreed to pay ATS's commercial prices for its training materials, but contended that ATS cannot be paid for its training materials at its commercial catalog prices because the solicitation and resulting contract were unambiguously cost-plus-fixed-fee (CPFF) and ATS submitted a CPFF proposal.[4] The government points out that there were only two line items in the contract, both of which were CPFF and one of which was not separately priced. Thus, it states, the government was obligated to pay ATS for its training materials at the allowable cost thereof, *unless* ATS satisfied the requirements of FAR 31.205-26(e) for billing at price. The government further contends that the record in this appeal demonstrates that ATS did not meet those requirements because (1) its interdivisional transfers of training materials were mere physical transfers lacking economic substance and thus did not qualify as interorganizational transfers under FAR 31.205-26(e); or, (2) even if the transfers qualified as interorganizational transfers under FAR 31.205-26(e), the transfers were recorded at cost, not price.

When the government disallows a cost on the basis of a FAR cost principle, the burden is on the government to prove that the costs are unallowable. *SRI International,*

---

[4] This is also the gist of the government's motion for partial summary judgment on Count 1 of ATS's complaint.

19

ASBCA No. 56353, 11-1 BCA ¶ 34,694 at 170,865-66, *modified in unrelated part*, 11-2 BCA ¶ 34,853. Both parties in this appeal agree that the government bears the burden of proving that ATS's interdivisional transfers did not qualify to be billed at price under FAR 31.205-26(e) (gov't br. at 11; app. br. at 20).

The "at price" exception to the material cost principle's requirement that materials be billed at cost under cost-reimbursement contracts applies to "materials, supplies and services that are sold or transferred between any divisions, subdivisions, subsidiaries, or affiliates of the contractor under a common control" when (1) it "is the established practice of the transferring organization to price interorganizational transfers at other than cost for commercial work of the contractor or any division, subsidiary or affiliate of the contractor under a common control"; (2) the item being transferred qualifies for an exception to the requirement to submit cost or pricing data under FAR 15.403-1(b); and (3) the contracting officer has not determined the price to be unreasonable. FAR 31.205-26(e). The government concedes that elements 2 and 3 are met by the training materials at issue.

The government's position is that element 1 is not met in this appeal, for two reasons. First, because ATS's transfers of training materials between the Logistics and Production division and the Training division lacked "economic substance" and therefore do not qualify as transfers within the meaning of the relevant cost principle (gov't br. at 12-16). Second, because even if the transfers qualify as such under the cost principle, the transfers were at cost, not price (*id.* at 16-17).

As to the alleged lack of economic substance, the cost principle does not impose a requirement that the transfers in question have "economic substance," and the government's support for urging us to adopt such a test is thin: a bare citation to a section of a cost accounting treatise that purportedly lists examples of interorganizational transfers (neither the text of the treatise nor the context was supplied to the Board) and a citation to a Cost Accounting Standards regulation that addresses when transfers between affiliates will be deemed "subcontracts" for purposes of CAS coverage (gov't br. at 14). We decline the government's invitation to read an "economic substance" requirement into the cost principle at issue. The government has failed to establish the existence of such a requirement or to suggest how a court or Board could tell if it had been met in a particular case.

While we do not accept the government's posited "economic substance" requirement, we also do not hold that the transfers were mere "physical transfers" lacking economic substance, as the government has argued. Instead, we find that the government has not met its burden to show that the transfers of commercial ATS training materials between ATS divisions were not the sort of transfers contemplated by FAR 31.205-26(e). The government argues that there could not have been a transfer between divisions based on (1) accounting entries in the 2007-2008

20

(Peachtree) ATS accounting records which it argues demonstrate that "[t]he training materials never entered the inventory of the Training Unit" (gov't br. at 14), and that the training materials were sold directly to the customer out of ATS product inventory (*id.*), and (2) the lack of accounting entries recording a sale or transfer from one division to another (gov't br. at 7, PFF ¶ 22).

The government offered no testimony or other evidence (other than the Peachtree accounting records) in support of its argument. Moreover, the government's argument relies on a negative—what ATS's 2007-2008 accounting records do not show. Those accounting records were the product of an unsophisticated small business accounting software application that did not provide visibility into transactions at the divisional level (finding 19). ATS witnesses testified credibly that the Training division determined what materials would be needed for a particular training and ordered the materials from the Logistics and Production division, the training materials were then transferred from the Logistics and Production division to the Training division at price, and that training materials never left Logistics and Production at anything other than commercial catalog price, whether on a direct sale to a customer or as part of a sale of training services. (Findings 20-23) Their testimony is uncontradicted.

ATS began to use more sophisticated accounting software (Deltek Costpoint) in January of 2009 that did provide visibility into transactions at the business unit level, but could not convince DCAA to review the subsidiary records detailing those transactions (finding 22). The Costpoint records show that when a sale of training services and materials was made, the Training unit issued an invoice to the customer that included the training materials at catalog price, and the sale amount for training materials at catalog price was recorded as Logistics and Production division revenue, but posted to accounts receivable for the Training division, which "owned" the contract and had the responsibility for collecting revenue from the sale (finding 27). The revenue summary for the Training division would be credited with the sale price for the training services, but its profit and loss statement for the period would not contain either revenue or cost related to the training materials since the materials were passed through to the end customer at price with a net impact to the Training division of zero (*id.*). The government failed to address the Costpoint records in its argument.

The fact that training materials never left the Logistics and Production division at anything other than price, and that there were valid business reasons for crediting that division with a sale at commercial price whether the transaction was external or internal, carries great weight. Additionally, we do not see how the accounts receivable amount for sales of training materials could be posted to the Training division account rather than the Logistics and Production account if there had not been a transfer of the materials. That the transfer may be essentially pass-through in nature does not prevent its recognition. *See, e.g., Pacific Gas & Electric Company v. United States*, 838 F.3d 1341, 1351-52 (Fed. Cir. 2016) (under the Uniform Commercial Code (UCC), a

middleman contract for purchase and sale is valid though the middleman will never have title to the goods, as title is to pass directly from the supplier to the customer of the middleman); *Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1371 (Fed. Cir. 2003) (applying UCC in determining whether suppliers sold parts to contractor prior to sale to government, court held that contractor acquired title from the suppliers and conveyed it instantaneously to the government when the engine sale was made). Thus, we find on the record before us that the training materials were transferred between ATS divisions within the meaning of the cost principle. The government has not met its burden to show otherwise.

We also find that the transfers were recorded by the transferring division at price, thus satisfying FAR 31.205-26(e). The government's argument that the transfers were recorded at cost rests on the proposition that any transfer between divisions would have had to take place *before* ATS sold the materials and issued the invoice, but since the first and only time the transaction is recorded at price is when the sale is made to the customer, *ipso facto*, if a prior transfer occurred at all, it must have occurred at cost. The government produced no evidence or law in support of this proposition. To the contrary, the United States Court of Appeals for the Federal Circuit has recognized in its *United Technologies* decision that more than one valid transaction may take place simultaneously, 315 F.3d at 1371, and ATS has produced credible evidence that such transfers were recorded by the transferring division at commercial catalog price.

The government has failed to carry its burden of proof to justify the disallowance under FAR 31.205-26(e). Because we have decided that ATS is entitled to recover its commercial catalog prices for training materials pursuant to FAR 31.205-26(e), we do not reach ATS's Count I claim that the contract, properly interpreted, also authorized ATS to bill and be paid for its training materials at commercial catalog prices. Our decision also moots the Army's motion for partial summary judgment, which was directed at Count I of ATS's complaint.

## CONCLUSION

The appeal is sustained and returned to the parties for determination of quantum.

Dated: 8 February 2017

LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

22

I concur                                                I concur


_____                         _____
MARK N. STEMPLER                                        RICHARD SHACKLEFORD
Administrative Judge                                    Administrative Judge
Acting Chairman                                         Vice Chairman
Armed Services Board                                    Armed Services Board
of Contract Appeals                                     of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59338, Appeal of A-T Solutions, Inc., rendered in conformance with the Board's Charter.

Dated:


_____
JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals